WILLIAM P. BIGGS, CLERK OF THE PEACE, AND *ex officio* CLERK OF THE LEVY COURT,

*vs.*

RICHARD G. BUCKINGHAM *et al.*

New Castle, March T. 1892.

*Plea to jurisdiction—Suit to enjoin mutilating tax list —Power to correct list.*

1. A plea that complainant has no right to maintain his suit in any of the capacities in which he sues, does not raise the question of jurisdiction in the court to hear and determine the matters in controversy.

2. A citizen and taxpayer of a county cannot maintain a suit on behalf of himself and all other taxpayers of the county to enjoin the striking of names from the tax list on the ground that his taxes will be thereby increased.

3. A county clerk of the peace and *ex officio* clerk of the Levy Court may maintain a suit to enjoin such court from striking names from the tax list so as to make it morally and legally unjust for him to join in a certification of the mutilated list and to render him liable to heavy pecuniary penalties for furnishing and certifying duplicates thereof to the county officers for collection.

4. The power to strike from the assessment list names alleged to be unlawfully thereon is not given to the Levy Court by Del. Rev. Stat., chap. 8, §§ 9, 12, authorizing it to "correct and add to the assessments returned" and to make "additions to and corrections of the assessment list."

5. No discretion is given by implication to the Levy Court to drop from the tax list names which it may judge to be illegally thereon, by a statute prohibiting the dropping of names "legally" thereon if the law itself designates certain classes of persons whose names shall not appear on the list; but the duty of the court is ministerial to drop all names belonging to the designated class and no others.

6. The law presumes that when an assessor returns his assessment at the time and in the manner provided by law, the names there-

Statement.

on legally appear unless the law itself shows the contrary by pointing out ascertained names that are forbidden to appear thereon.

7. Express authority of the legislature is required to enable a Levy Court to judicially determine that names on a tax list are illegally there and to strike them off if they are not within any of of the classes which the law itself provides shall not be on the list.

8. A county clerk of the peace who is under heavy penalties charged with the duty of placing upon the collectors' duplicates the names of taxables as returned by the assessors has such a special interest in the preservation of the lists as to be entitled to maintain an injunction suit to prevent them from being mutilated.

BILL FOR INJUNCTION.—This suit was to enjoin defendants as members of the Levy Court from striking off from the assessment lists names placed there by the assessors and alleged by the defendants to be wrongfully there.

STATEMENT BY THE CHANCELLOR.—The bill in this case is filed by William P. Biggs, in his own behalf, as a citizen and taxable duly assessed in the Hundred of St. George's, in the County of New Castle and State of Delaware, and on behalf of other taxable citizens of said county, similarly situated in respect to the matters thereinafter set forth and complained of, and by the said William P. Biggs, as clerk of the peace, duly commissioned according to law in and for the said county, and by the said William P. Biggs, as clerk of the Levy Court of said county.

The bill then sets forth the names of the several assessors for the first, second, and third assessment districts of Wilmington Hundred, and the names of other persons and the hundreds in said county in which they reside, and declares that the persons so named were severally duly elected and qualified according to law to be, and

are now, the legal assessors of the assessment districts and hundreds in which they are respectively resident.

That the said assessors on Tuesday, the second day of February, A. D. 1892, in pursuance of the laws of the said State in such case made and provided, delivered up and returned to the Levy Court of said county the assessment lists of their respective assessment districts and hundreds.

That the said Richard G. Buckingham, James H. Clark, Andrew S. Eliason, Isaac N. Grubb, Paul Gillis, Henry D. Hickman, David P. Hutchinson, John W. Jolls, Samuel Kilgore, Robert B. Simpler, and Robert Sutton are the regularly elected and duly qualified Levy Court commissioners of said county, and together constitute the Levy Court of said county.

That the said Richard G. Buckingham, James H. Clark, Andrew S. Eliason, Isaac N. Grubb, Paul Gillis, Henry D. Hickman, David P. Hutchinson, John W. Jolls, Samuel Kilgore, Robert B. Simpler and Robert Sutton (constituting the Levy Court aforesaid) have now in their control the said assessment lists so returned and delivered up as aforesaid.

That the said Levy Court commissioners since the return as aforesaid of the said assessment lists in the progress of the examination and correction of the assessments so returned by the said assessors, have already obliterated, erased, and stricken off from the said lists the names of persons appearing on the lists returned by the said assessors as taxables of the said county, and have so obliterated, erased, and stricken off the same unlawfully and without proper right, and in violation of the rights of the persons whose names have been so stricken off and in violation of the rights of the complainant as a citizen of the said county and others similarly situated as himself in respect of said act.

The complainant states that he is credibly informed and verily believes and so avers and charges that it is the intention and the purpose of the said commissioners of the said Levy Court so constituted as aforesaid, acting upon such information as they may deem proper or expedient arbitrarily and without warrant of law to change and alter the said lists by striking off and expunging therefrom all or any such name or names as they may consider or declare not "legally" upon the lists aforesaid.

That the Levy Court commissioners aforesaid assuming as aforesaid and usurping the power unlawfully and arbitrarily to reduce the number of names upon the said lists of persons assessed as taxables, without notice to the said persons, and after the publication of their names by the assessors in accordance with the law, thereby inflict an irreparable injury, not only upon the persons whose names are so stricken from the assessment lists, but also upon the complainant as a taxpayer and contributing member of the community, and upon many others in like condition with himself, by depriving them of the benefit and assistance that would otherwise be derived from the payment of the taxes necessary for the maintenance of the government of the said county, so assessed to the persons aforesaid, whose names have been or may be unlawfully stricken off as aforesaid from the said assessment lists.

The complainant states that he is clerk of the peace of said county, and that the functions, duties, and responsibilities of his said office imposed upon him by law have already been and are about to be seriously impaired, invaded, and overthrown, greatly to the embarrassment and injury of all the citizens of the said county by the aforesaid continued unlawful and unwarranted action and conduct of the said Levy Court commissioners in

altering and defacing the said assessment lists, so that it will be morally and legally improper and unjust for the complainant to join in the certification of the correctness and legality of said assessment lists when the same come to be delivered to the receiver of taxes as provided by law.

That the said Levy Court commissioners have already undertaken, and without warrant of law, to add to the said assessment lists at other times and places and in other modes than are provided by the laws relating to such conditions, that is to say that the said Levy Court commissioners at the date subsequent to the date fixed by law for the return of the said assessment lists have added the names of persons not personally appearing before the said Levy Court as required by law, nor vouched by such proof as is required by law, nor attested in a manner prescribed by law, whereby the said assessment lists are not such as are prescribed by law, nor proper for the legal certification by the complainant as clerk of the peace of said county, when duplicates are to be delivered to the officers charged by law with the collection and receipt of taxes of the said county.

That the complainant, as clerk of the Levy Court, is powerless to prevent the aforesaid defacement, violation of, and unlawful alteration already committed, and which are threatened and intended to be committed hereafter in the said assessment lists, with the safe keeping of which he is by law expressly and officially charged.

The complainant avers that he is without any remedy at law for the injuries and wrongs already done and committed as aforesaid by the said Levy Court commissioners and that the deprivation of the right of elective franchise and his dearest rights as a citizen, and of all other citizens similarly situated with himself, are imperiled by the action and the threatened exercise and con-

tinued assertions of unlawful powers aforesaid by the said Levy Court commissioners and that the interposition, and equitable exercise of the restraining powers of this court are necessary to save and to prevent him and others in like situation from an irreparable injury for which no other remedy exists.

The complainant prays that the said Richard G. Buckingham, James H. Clark, Andrew S. Eliason, Isaac N. Grubb, Paul Gillis, Henry D. Hickman, David P. Hutchinson, John W. Jolls, Samuel Kilgore, Robert B. Simpler, and Robert Sutton, and each of them, may be restrained by the injunction of the court from striking from the said assessment lists as aforesaid made and returned to the said Levy Court by the said assessors, any names or name whatever appearing upon the same and returned as taxables of the said county, or from adding to the said lists any other names otherwise than at the time and place, and in the manner provided by law, in that behalf. And that by an order of this court the names of such persons as have been so as aforesaid unlawfully placed upon said lists by the authority or connivance of the said Levy Court commissioners since the return of the said lists by the said assessors shall be stricken off the said lists.

The bill also prays that the complainant may have such other and further relief as the nature of the case may require.

And that a subpœna may issue for the said Richard G. Buckingham, James H. Clark, Andrew S. Eliason, Isaac N. Grubb, Paul Gillis, Henry D. Hickman, David P. Hutchinson, John W. Jolls, Samuel Kilgore, Robert B. Simpler and Robert Sutton, as defendants in this cause.

Upon the presentation of the said bill of complaint to the chancellor, he, on the seventeenth day of February, of the present year, made an order thereon in these words:

"And now, to wit, this seventeenth day of February, A. D. 1892, the within bill having been read and considered, it is ordered by the Chancellor that a rule be issued and served upon the defendants to show cause why the injunction prayed by said bill should not be awarded, returnable before the chancellor in the county court house, Wilmington, on Friday, the nineteenth day of February at eleven A. M. o'clock; and it is further ordered that the defendants be and they are hereby restrained until the hearing and final determination of said rule from striking from said assessment lists of the said several districts and hundreds of New Castle County aforesaid, made and returned to the said Levy Court by the said several assessors, any name or names whatsoever appearing upon the said lists and returned as taxables of the said county and from adding to the said lists any other names otherwise than at the time or times and place and in the manner provided by law.

And the subpœna will be issued as prayed by the complainant."

To the bill of complaint two answers were filed, one being the joint and several answers of Richard G. Buckingham, James H. Clark, Paul Gillis, David P. Hutchinson, John W. Jolls, and Robert B. Simpler, six of the above-named defendants on behalf of themselves, and the Levy Court of New Castle County.

In the first paragraph of said answer the said six commissioners of the Levy Court of New Castle County admit that the persons named in the first paragraph of the bill of complaint were severally duly elected and qualified according to law to be, and that they are now, the legal assessors of the assessment districts and hundreds of which they are respectively residents, as set forth in paragraph 1 of said bill of complaint.

It is also admitted in this said answer that the said

assessors on Tuesday the second day of February, A. D. 1892, in pursuance of the laws of the State of Delaware in such cases made and provided, delivered into and returned to the Levy Court of New Castle County the assessment lists of their respective assessment districts and hundreds as set forth in paragraph 2 of said bill of complaint. But the said six defendants aver that some of the said assessment lists were not made pursuant to . the laws of said State but on the contrary thereof were in large part illegal and fraudulent as thereinafter set forth.

The answer of the said six defendants admits that the said Richard G. Buckingham, James H. Clark, Andrew S. Eliason, Isaac N. Grubb, Paul Gillis, Henry D. Hickman, David P. Hutchinson, John W. Jolls, Samuel Kilgore, Robert B. Simpler, and Robert Sutton are the regularly elected and duly qualified Levy Court commissioners of the said county as set forth in paragraph 3 of said bill of complaint.

The answer of these defendants further admits that the said Richard G. Buckingham, James H. Clark, Andrew S. Eliason, Isaac N. Grubb, Paul Gillis, Henry D. Hickman, David P. Hutchinson, John W. Jolls, Samuel Kilgore, Robert B. Simpler, and Robert Sutton, constituting the Levy Court aforesaid, have now in their control the said assessment lists so returned and delivered up as aforesaid, as set forth in paragraph 4 of said bill of complaint.

The said six defendants in their said joint and several answer to the bill of complaint say they do not admit but on the contrary deny the truth of the allegations contained in paragraph 5 of said bill of complaint in manner and form as the same are therein set forth. And they further deny that the said Levy Court commissioners, since the return of the said assessment lists aforesaid,

have unlawfully or wrongfully obliterated, erased, or stricken off the names of any persons appearing on the said lists returned by the said assessors as taxables of said county.

The said six defendants aver in their said answer that whatever names have been stricken by the said Levy Court commissioners from the said assessment lists as returned as aforesaid, were names illegally placed thereon, and that the said Levy Court commissioners have not, nor have any of them, obliterated or erased any of the names so stricken from said list.

The said six defendants further say that they do not admit, but on the contrary deny, the truth of the allegations contained in paragraph 6 of said bill of complaint in manner and form as the same are therein set forth. And they further deny that it was or is the intention or purpose of the said commissioners of said Levy Court to change or alter the said lists or any of them by arbitrarily or without warrant of law striking off or expunging therefrom any name or names whatsoever appearing thereon. But the said six defendants in further answer to the allegations contained in said paragraph 6 aver that it is the purpose and intention of these defendants as constituting a majority of said Levy Court, to cause to be stricken from said assessment lists so returned as aforesaid, such names, and only such names, as the said Levy Court, while engaged in the discharge of the legal duty imposed upon it of revising and correcting said lists, shall be satisfied on due examination were unlawfully placed and do not legally appear thereon.

The defendants say they deny that the said Levy Court commissioners or any of them have or has assumed or usurped the power unlawfully and arbitrarily to reduce the number of names upon the said list of persons assessed as taxables as falsely charged in paragraph 7 of bill of complaint.

The said defendants admit that the said William P.
Biggs is clerk of the peace of said county, but they do
not admit, but on the contrary say they deny, the truth
of the other allegations contained in said paragraph 8 in
manner and form as the same are therein set forth ; and
say they deny that the functions, duties, and responsibili-
ties of the said William P. Biggs, as clerk of the peace
as aforesaid, imposed upon him by law, have been or are
about to be impaired, invaded, or overthrown by any ac-
tion or conduct of the said Levy Court or any of the
commissioners thereof ; and further deny that it will be
either morally or legally improper or unjust for the said
William P. Biggs, clerk of the peace as aforesaid, to
join in the certification of the correctness and legality of
the said assessment lists as the same shall be revised and
corrected by the said Levy Court when the same come
to be delivered to the receiver of taxes as provided by
law as falsely charged they say in paragraph 8, but on
the contrary they aver that the said William P. Biggs,
clerk as aforesaid, before entering upon his official duties,
made solemn oath that he would faithfully and impar-
tially perform all the duties of his said office with fidel-
ity.    And among said duties they aver is the duty
expressly enjoined by the statute in that behalf that the
said William P. Biggs, clerk as aforesaid, should observe
the orders and rules of the said Levy Court in all things
relating to the duties of his said office.

The defendants say that they do not admit, but on the
contrary deny, the truth of the allegations contained in
paragraph 9 of said bill of complaint in manner and form
as therein set forth, but admit that after the return to
the said Levy Court of said assessment lists as aforesaid
one of the said assessors did, by direction of one, and
only one, of the said Levy Court commissioners, add to
the assessment list so returned by the assessor the names

of two persons who had appeared before said assessor whilst sitting for the correction of errors in his said assessment, and been duly vouched for by affidavit pursuant to the statute in that behalf, the said assessor, at the time of adding the said two names as aforesaid, then having in his possession the proper vouchers for the said two persons, and the said commissioners of the Levy Court so directing said two names to be added to said assessment list, then believing that under the statute of the State of Delaware the said two names should be so added to the said list after the return thereof by the assessor as aforesaid. And the said defendants aver that upon the adding of said two names to the said assessment list, a question arose among the said Levy Court commissioners, whether said two names had been lawfully added to said list, and that thereupon several Levy Court commissioners consulted the attorney of the said Levy Court upon the subject and were advised by said attorney that said two names had been added to the said assessment list unlawfully and should be forthwith stricken from the same, and that immediately after said advice from said attorney, the said Levy Court did order and caused the said two names so added to the said list to be stricken therefrom.

And the said defendants deny that the said Levy Court commissioners have undertaken at their will and pleasure without warrant of law to add to the said assessment lists at other times or places or in other modes than are provided by the law on that behalf as is falsely charged they say in said paragraph 9 of the bill of complaint.

And the said defendants further deny that the said Levy Court commissioners or any of them save as hereinbefore stated at a date subsequent to the date fixed by law for the return of said assessment lists by the said

assessors have or has caused to be entered upon the said assesment lists the names of any persons not personally appearing before the said Levy Court as required by law, or the names of any persons not vouched for by such proof as is required by law or attested in the manner described by law, as falsely charged they say in the said paragraph 9 of said bill of complaint.

The said defendants deny that the said Levy Court commissioners have caused or been guilty of any defacement, violation or unlawful alteration of said assessment lists, or any of them, or that the said Levy Court commissioners intend or propose at any time to cause any defacement, violation, or unlawful alteration in the said assessment lists or any of them as falsely charged they say in paragraph 10 of the bill of complaint.

They say that since Tuesday the second day of February, instant, certain reputable citizens and taxpayers of New Castle County have openly and publicly charged that a very large number of names appearing upon some of the assessment lists returned by said assessors to the said Levy Court on the said second day of February, instant, were unlawfully placed and do not legally appear upon said assessment lists, and that the said names so unlawfully placed upon said assessment lists include a large number of fictitious names placed upon the said lists in direct violation of the statute of this State on that behalf, and also a large number of names of poll taxables who were not residents of the hundreds or assessment districts, from which they were respectively returned by said assessors as assessed, placed upon said lists in direct violation of the Statute of this State on that behalf, and also a large number of names of poll taxables already assessed standing upon the assessment lists of said hundreds or districts respectively, and unlawfully placed upon said assessment lists returned on the second day of

February, instant, as aforesaid, and also a large number of names of poll taxables unlawfully and fraudulently duplicated upon said assessment lists returned as afore-said.

That the commissioners of the said Levy Court, recognizing that it is of paramount importance that the lists as finally revised and corrected by the said Levy Court shall be true and accurate lists and thereby serve at once to furnish a sound and reliable basis for the adjustment of the tax rate for the present year at such a percentage as shall produce adequate revenue for the government of New Castle County and to prevent the false registration of voters and the debauchery of the ballot box in said county, are now engaged in the examination of said assessment lists as so returned as aforesaid for the purpose of ascertaining whether or not names appearing upon said lists have been unlawfully placed thereon as aforesaid; and these defendants as constituting a majority of the said Levy Court propose and intend, should they be satisfied upon due examination that any names have been so unlawfully placed upon said assessment lists, so returned as aforesaid, and do not legally appear thereon, to cause the same to be stricken from said lists; not by obliteration, erasements, defacement, or mutilation of said lists or any part thereof, but by the placing of a distinguishing mark upon or opposite such names as shall be stricken from said lists.

The defendants say they deny the truth of the allegations contained in the bill of complaint that irreparable injury would be done the complainant, either as an individual taxpayer of New Castle County or as clerk of the peace thereof or as clerk of the Levy Court thereof, by striking as aforesaid from said assessment lists so returned as aforesaid all fictitious names and names unlawfully placed thereon as aforesaid.

And the said defendants aver that should the said Levy Court, in striking any names from said assessment lists through error or mistake, cause the names of any persons which lawfully should remain upon said lists to be stricken therefrom, all such persons have, under the statute in such case made and provided, a full and adequate remedy by appearing before the said Levy Court, accompanied by some suitable voucher for their right to appear on said assessment lists.

In conclusion the defendants say that they are advised and believe that the complainant, William P. Biggs, has no right to bring and maintain this suit as a citizen taxable and resident of New Castle County, and as clerk of the peace for said county and as clerk of the Levy Court of said county, or in any of said capacities, either in his own behalf, or in behalf of other taxable citizens of said county, and they crave all benefit and advantage which they could or would obtain by demurrer, or plea in this behalf.

Andrew S. Eliason, Isaac N. Grubb, Henry D. Hickman, Samuel Kilgore, and Robert Sutton, five of the defendants, in their answer to said bill of complaint, say that they admit the allegations contained in the first paragraph of the bill of complaint to be true. They say they admit the allegations contained in the second paragraph of the bill to be true. They also admit the allegations contained in the third paragraph of the bill to be true. And they admit the allegations contained in the fourth paragraph of the bill to be true; and for further answer the said five defendants say that they believe to be true the allegations contained in the fifth and sixth paragraphs of the said bill.

And that the said Levy Court, by the vote and action of Richard G. Buckingham, James H. Clark, Paul Gillis, David P. Hutchinson, John W. Jolls, and Robert B.

Simpler, a majority of the said Levy Court, against a protest of these five (co-defendants) contemplate and intend to obliterate and strike from the assessment lists of the several assessors as returned by them in accordance with law, a large number of names now appearing thereon, which said action the said defendants, Andrew S. Eliason, Isaac N. Grubb, Henry D. Hickman, Samuel Kilgore, and Robert Sutton are advised and informed and so believe would be illegal and without any authority of law, because as they are advised and informed and so believe the names of those legally appearing upon the said assessment lists are the names of those who are returned by the assessors, and that the said lists so returned are the lists of the assessors respectively, for the correctness of which, under the law, they are responsible. And that no power exists in the said Levy Court to vacate or revise in the manner and to the effect aforesaid the action of the said assessors.

These five defendants further answering, say, that by reason of the action and votes of the majority of the said Levy Court commissioners the time fixed by law, to wit, the nineteenth day of February last past, within which the assessment lists, alphabetically arranged, should have been according to law set up by the clerk of the peace of the said county in five of the most public places in each hundred and election district thereof, has expired, so that the notices of appeal required by law have not been given, and that no further control or supervision of the same by the Levy Court or any one else can properly or legally be exercised except in so far as the Levy Court in the manner provided by law can add to the said lists the names of such as may have been omitted. And further they answer that the allegations contained in the seventh, eighth, ninth, tenth, and eleventh paragraphs of the said bill are true, and therefore they admit the same to be true.

*Thomas F. Bayard*, for the complainant:

The controlling question to be considered in the case as it stands is whether under provisions of existing law the power is lawfully invested in the Levy Court to purge the assessment lists as returned to them by the assessors of such names as they shall consider do not " legally appear upon them."

In construction of statutory powers the rule is, such power or right must be pursued in strict compliance with the terms of the statute.   See Endlich, Interpretation of Statutes, § 353, and numerous cases cited.

That a literal construction has but a prima facie preference, and that to arrive at the real meaning it is always necessary to take a broad general view of the Act so as to get an exact conception of its aim and scope and object, —see Id. § 27; and the rules of *Lord* Coke in the consideration of statutes :   (1) What was the law before the Act was passed ?  (2) What was the mischief or defect for which the law had not provided ?  (3) What remedy the Legislature had appointed ?  (4) The reason of the remedy.

It is an elementary rule that construction is to be made up from all parts of a statute put together—not from one part only by itself.   Endlich, Interpretation of Statutes, § 35.

And this rule has found expression in a vast number of cases in England and the various states of this Union. See Id. *note b*, and cases collected.

The meaning of words may be explained or limited or expanded by the context.

It is a necessity of proper statutory construction to give effect to every word, clause, and provision of the enactment.   Possibly the most important purpose of the construction of all the parts of a statute together and with reference to one another is that of giving, by the means of such comparison, a sensible and intelligent ef-

fect to each without permitting any one to nullify any other, and to harmonize every detailed provision of the statute with the general purpose or particular design which the whole is intended to subserve.    With this end in view the rule extends to acts and their amendments, which for this purpose are regarded as constituting but one enactment, so that no portion of either is to be left without effect.

A code or body of revised laws should, it is said, be regarded as a system of contemporaneous acts—as established *uno flatu.*

And in section 40 of Endlich the cases supporting these rules are cited *passim.*

All acts *in pari materia*, whether repealed or existing, may properly be considered.    Endlich, Interpretation of Statutes, §§ 43–48.

With such elementary rules let the legislative history of the Levy Court be examined.

It is wholly the creation of statutes, the earliest of which was enacted in 1742.    See vol. 1, Del. Laws, p. 257.    And the title of the Act indicates the nature and object of the duties involved :    " An Act for Raising County Rates and Levies."

The composition of the court—of assessors, grand jurymen, and justices of the peace—indicates its general purposes.

The object for which the Levy Court was created was simply a box of tax commissioners to levy rates equitable among the population, so that none should escape from contribution to public uses, and none should be denied the opportunity to have a voice in the choice of their rulers.

The main purpose of the Levy Court was to enfranchise the citizens, and through enfranchisement to create a voluntary government and provide money by taxation for its support.

The Levy Court was never part of the judicial system of the State, and has no mention in the constitution. No Act of Assembly, and no section, ever bestowed judicial authority, either civil or criminal.

Its powers are discretionary and sometimes judicial in their nature, as when applied to valuation, but more frequently ministerial. To guide it in matters of law, it is allowed to choose and employ legal counsel by whose opinions its decisions are attained—but who has no legal or official responsibility for the advice he may give to his clients. Its transaction of business partakes more of legislative methods, and in a very remote degree and rarely of the judicial, but its powers and jurisdiction are strictly statutory, and are to be construed according to the rule, in strict compliance with the terms of the legislative expression. In vol. 2, p. 1086, Del. Laws, A. D. 1793, the organization of the Levy Court of New Castle by eleven commissioners first was enacted and has been continued into the Revised Code of 1852, and now constitutes chapter 8, with the amendments of April, 1891. See vol. 19, Laws, p. 58.

In the fiscal government of the county the Levy Court has co-operative functions with other co-ordinate, but wholly independent, officials; of these the assessors are the most important as bearing upon the questions in controversy in this case, and are found in chapter 10 of the Revised Code and the amendatory Acts.

These assessors are freeholding citizens elected in the respective hundreds and election districts, sworn to perform the duties which are many and highly responsible, requiring integrity, intelligence, and local and personal knowledge, and set forth and described with strict care and particularity in the statutes. From none of their functions can the Levy Court absolve them, nor can they try or punish, or reward them in any way. They have

certain defined powers of revision and correction of the assessment lists when returned by the assessors, but the independence of the two offices of each other is not lost sight of in the statutes regulating their functions.

The clerk of the peace is an officer under the constitution, appointed by the governor, who is bonded and sworn, and whose general duties are set forth in chapter 9 of Rev. Code, p. 71. By section 24 of that chapter he is made clerk of the Levy Court of the county, and his duties to the said court are contained in that section alone and his other and independent duties are found in many statutes.

Thus by the long-continued arrangement of the laws of Delaware, a distinct distribution of official powers is found, having for its object the protection of the rights of the citizen, financial and political, and their departments of power cannot be merged or their lines obliterated without the express warrant of the law.

The functions of these three separate departments— assessors, Levy Court commissioners, and clerk of the peace—provide securities for the taxpayers which cannot be denied or impaired. Thus by existing law, vol. 16, p. 302, it is made the duty of the assessor in each hundred or election district to post in at least five of the public places in each hundred or election district an alphabetical list of the persons assessed, their property and rates, etc., and in the same manner to give notice that he will attend at a certain day, time, and place "to correct errors in his assessments, and for the purpose of assessing any person who may have been omitted." And by a subsequent section of the same Act it is made the duty of the clerk of the peace on the 20th day of February to hang up in five places the assessment list. See vol. 16, p. 302.

If these published lists are not to stand as notices that

those persons whose names appear thereon shall be regarded as assessed, and shall not be removed therefrom, the purpose of the law in causing such publication will be wholly defeated, and the proceeding converted into a fraud upon the intending voter and taxable, and a loss inflicted upon the revenues of the county. By chapter 8 of Rev. Code, p. 62, § 9, power is given to the Levy Court to examine, correct, and add to the assessments returned by the assessors, and in section 10 : " It shall be the special duty of the Levy Court to see that the principle of assessing property according to its true value is carried out and executed by the assessors, and for that purpose to correct any assessments."

Section 11 directs the Levy Court to sit on the first Tuesday in March in every year as a court of appeal, to examine the assessments returned by the assessors, and the corrections thereof and additions that may have been made, and to hear and determine appeals against the same. It is thus obvious that appeals thus reserved to taxable citizens are to be made against what appears on the lists and has been published—and to supply omissions.

Section 12 gives power to the Levy Court either upon their own examination or upon appeal to increase or diminish any assessment and to make any additions to and corrections of the assessment list ; to call before them any person whose name ought to be on the assessment list and who was omitted by the assessor or by the court at its former meetings.

Section 13 gives the Levy Court power to arrange all the assessments according to right and justice so that no person may be unequally assessed or overrated in the county, etc.

Section 14 provides that no assessment list shall be liable to be called in question elsewhere than in the Levy

Court, and the same as it shall stand in the said Levy Court shall be absolutely conclusive.

Section 15 provides that no assessment shall be made after the last day of March.

The powers above recited relate to the assessments and valuations of property and the " corrections " referred to are manifestly arithmetical and clerical but cannot be expanded into powers to strike off names and reduce the number of taxables and the taxes which are by them payable.

To argue such a power is to disregard the great purpose and intent of the law.

But in section 21 of the same chapter, pages 65 and 66 of the Revised Code, the power is given to the Levy Court to examine and settle the delinquent lists of each collector of state and county taxes, and the language is mandatory and explicit. " The name of the delinquent and if he be dead or have removed from the State shall be struck from the assessment list and also from the collector's duplicate ; otherwise it shall remain on the assessment and be entered on the collector's duplicate for the succeeding year."

The words " correct " or " correction " are never employed in any of these statutes as verbal alternatives or synonyms or equivalents for the words " be struck from" —or " otherwise shall remain on."

All of these words are used in the same Act and those last referred to in a subsequent section of the Act. The power sought to be derived from the words first used can only be gained by a forced and extreme construction and disassociating from the context and subject—in connection with which they are employed—while the last quoted language is express, clear, and unambiguous and employed in limitation and control of the power now undergoing examination.

In *Frieszleben* v. *Shallcross*, which was decided on January 29, 1890, in the Court of Errors and Appeals in this State, it was held that, " under the legislation prior to the enactments of 1873, provision was made expressly requiring the dropping of the names of those persons who had died or had removed from the State in any year from the assessment lists of the next ensuing year. But no such provision was made for the dropping also of the names of those who had been found by the collector to be incapable of paying any tax, or to be fictitious and non-existent."

By the Act of April 9, 1873, published in Rev. Code, p. 82, it was provided by section 9 that it shall not be lawful for any assessor or any Levy Court upon the personal application of any one or otherwise to place upon the assessment in any hundred the name of any person who, having failed to pay the county tax assessed against him or her for the preceding year, was returned and allowed as a delinquent until after the expiration of the twelve months from the time such allowance as delinquent was made by the Levy Court.

And by the Act of April 10, 1873 (see Rev. Code, p. 90), it was in the first section provided, " that it shall be the duty of the Levy Court in every county (upon proof made by the collector by his affidavit, etc.), to allow said collector as delinquencies the taxes uncollected by him, and the names of such delinquents shall be dropped from the assessment list by the Levy Court and shall not be placed thereon again for a period of twelve months from and after the date of such allowance, provided that the provisions of this section shall apply to persons assessed and liable to pay poll tax." These two provisions of law stood upon the statute book until the middle of May, 1891, when they were both repealed (vol. 19, p. 78).

And they must both be read and considered as parts

of and in connection with the Law of April 8, 1881 (vol. 16, p. 302), the said sections of the assessment laws being incorporated in that statute as published, and also section 1 of the Act of April 10, 1873, being *in pari materia* and part of the system of law in relation to the removal of names from the assessment lists.

The clear and unambiguous language thus employed conveys none but express and ministerial powers over the assessment lists, and creates no new jurisdiction of a judicial nature nor any new powers by implication.

The statute under which the present six defendants, constituting a majority of the Levy Court, allege that they find legal power to strike from the assessment lists all and every such names as they may consider do not lawfully appear thereon, is to be found at pages 304–307 of volume 16 of the Laws and in the Act of April 9, 1873, amended and printed as amended.

In section 6 of the Act it is provided, " That it shall not be lawful for the Levy Court in either of the counties of this State, or any member thereof, to take from the assessment returned to said Levy Court by any assessor the name of any person legally appearing thereon, etc." See page 306, vol. 16, Laws.

By comparing this phraseology with the Act amended (see Rev. Code, p. 83), it will be found that the only change in the amendment is the interpolation of the word " legally " before the words appearing therein. And this word "legally" is claimed by the defendants by necessary implication to create and vest in the Levy Court an unlimited power to strike off all and any names that shall in their judgment illegally appear thereon.

This word " legally " first appeared in its present context by the enactment of April 8, 1881, at which time and for ten years subsequently, the mandatory provisions of the Act of April 9, 1873, relating to the duties of as-

sessors, and the Act of April 10, 1873, relating to the duties of collectors, and prescribing the delinquent taxables should not be placed on the assessment list and the list of ascertained delinquents whose names should be dropped from the said lists by the Levy Court, remained in force controlling the action of the assessors and the Levy Court in relation to dropping or taking the name of any person from the assessment lists.

The definite force and meaning of the word "legally". is reasonably obtained and measured by coupling it with the 9th section of the same Act expressly inhibiting "any assessor or any Levy Court from placing on the assessment list the name of any person who having failed to pay the county tax assessed against him or her for the preceding year was returned and allowed as a delinquent until after the expiration of twelve months after such allowance as delinquent was made by the Levy Court," and the cognate section 1 of the concurrent Act of April 10, 1873 (see page 90 of the Revised Code), by which it was made the express duty of the Levy Court to drop from the assessment list the delinquents returned by the collector and allowed by the Levy Court. The duties so imposed were simply ministerial, and the names so to be dropped were names ascertained by lists furnished by the collectors to the Levy Court.

These provisions were only repealed after a new system for the collection of taxes was enacted by the Legislature April 28, 1891, Laws, vol. 19, p. 58, etc., by which all connection between the Levy Court and the collection of taxes was ended, and by the substitution of a new officer called the Comptroller of New Castle County with whom all settlement of taxes by the receiver and collectors was thereafter to be made. When this new arrangement went into operation the two provisions of law to which the word "legally" had reference and application were repealed.

To give the word "legally" the effect of creating a judicial power, summarily, and at will, without any of the methods of judicial procedure, and wholly in disregard of all the other provisions of the section of the Act in which it is found, would be to violate every rule of statutory interpretation already cited in this paper.

If its literal meaning be insisted upon, so must the literal meaning of the words with which it is associated, if an implied power be elicited, then none of the expressly described agents to execute the power can be excluded, and the implied judicial power so to strike off all names "illegally" appearing on the assessment lists returned to the Levy Court can be exercised not only by the Levy Court, but equally by "any member thereof," for the words are disjunctively used, "the Levy Court in either of the counties, or any member thereof." This result cannot be avoided if the interpretation of a grant of substantive power is to be created by implication from the presence of the word "legally," as it is found in the Act; the power must rest in those expressly indicated to exercise it, and cannot be restrained to a part of them. But it is a new and summary power which is never to be created by implication; and in the degree it is claimed by the six defendants in their answer, it would sweep away every right of any taxable citizen to qualify himself for the exercise of the elective franchise and would practically result in handing over to the Levy Court or a majority of its members the sole nomination of the electors for the County of New Castle. The functions of the assessors and the posting of their notices and lists would be an idle form, for the power would remain until the last day of March in the Levy Court to strike from the assessment lists, without hearing and notice, all such names as they should consider did not "legally appear thereon," and after that date the lists cannot be changed.

It would in effect replace a government of laws by a government of will.

It is held by law-writers that usage should be taken into consideration in determining the meaning of a word (Endlich, Interpretation of Statutes, § 34, cited *supra*)' and as the history of the proceedings in the Levy Court is of long standing, and as one of the learned counsel for the defendants, Mr. Spruance, has given his testimony to the effect that it never entered into his mind during the years he was counsel for the Levy Court to doubt the existence of the power he now claims for his clients (although he was not understood to say it had been so exercised), it may be proper to say that in the service of the Hon. George Gray, as counsel of the Levy Court for ten years, of Mr. Rodney for about the same period, and John R. Nicholson for twelve years, no such power was ever exercised, and on the contrary its existence denied and repudiated by each of them and the Levy Courts to whom they gave counsel.

The section of the statute in which the word "legally" is so found contains many minute and carefully restricted delegations of authority, no one of which asserts or is consistent with the implied grant of power now contended.

It is on the contrary in direct and irreconcilable conflict with the duty imposed by the same section upon the clerk of the peace (sec. 6, p. 306, vol. 16): "If the clerk of the peace shall neglect to place on the collector's duplicate for any hundred any name which may have been on the assessor's list for said hundred, delivered by the assessor to the clerk of the peace, he shall forfeit and pay to the person whose name shall have been so omitted the sum of ten dollars. Proceedings shall be before any justice of the peace, and the proceedings shall be in the same form as in actions for debt, and the assessor may be summoned as witness in said case, and compelled to

exhibit the certificate of assessment from the clerk of the peace."

It is by this provision of the law made apparent that the threatened and intended exercise of power will invade, injure, and overthrow the clerk of the peace in the performance of his express duties, and subject him to heavy penalties should the list prepared and certified by him for the collecting officials be expurgated of "any names" by the Levy Court, which have been thereon when returned by the assessor.

The personal loss and injury to the clerk of the peace is thus threatened to be made ruinous if the power claimed and intended by the Levy Court be exercised by striking off names in their discretion.

To assent to such an interpretation of the word "legally" as it stands in the statute would work an implied repeal of the letter and meaning of all other statutes *in pari materia*, and strike free government at its very heart and originating process.

As to the allegation of want of proper parties to the bill of complaint made in the argument but not pleaded nor properly averred in the answer, the defendants have elected to go to hearing upon the bill of complaint and answer. They have filed no plea to the jurisdiction of this court, nor have they demurred to the bill of complaint for want of jurisdiction or for any other cause. Moreover, in open court, they have conceded in the argument of both counsel the jurisdiction of this court.

Nevertheless under the 13th article of their answer, wherein they allege that they are advised that the complainant has no right whatever as an assessed citizen and taxable of the county nor as clerk of the peace nor as clerk of the Levy Court, to bring or maintain this suit in his own behalf or in behalf of any other persons, the defendants have in this manner sought to obtain all ad-

vantage of pleas which they have not filed and defenses which they have not set up and which they have no right under the rules and practice of courts of chancery irregularly and unjustly to introduce in argument and which therefore should be denied. See Adams, Doctrine of Equity, page 333 (*m*), also p. 335 (*m*).

In all cases the rule prevails that the extent to which the demurrer is meant to be a defense should be distinctly pointed out. For a demurrer cannot be good in part and bad in part, but if it be general to the whole bill and there be any part of either as to relief or discovery to which an answer is requisite, the demurrer being entire, must be overruled. And see 1 Daniel, Ch. Pr. 538–540.

Therefore not having by demurrer " distinctly pointed out" such a defense, nor having raised it by plea, or by any plea in bar or to the action, it is not competent for the defendants to convert allegations of their answer not responsive to the bill and which does not contain any of the averments requisite to a plea or demurrer to the jurisdiction into either of such defenses, and to allow the same would be inequitable and unjust.

Nevertheless while insisting against the wrong and irregularity of permitting such a defense to be so raised and considered, the complainant respectfully submits.

The present bill of complaint avers the jurisdiction and invokes the injunctive process of the court, to prevent an irreparable injury to him as a private citizen, taxable and entitled to become qualified for the exercise of the elective franchise and one of a special class of such taxable citizens threatened with irreparable injury. The bill charges and the answer admits the intention of the six defendant members of the Levy Court to assume the power to commit the acts which endanger the complainant as he has complained.

That the injury is irreparable is fully shown by an

examination of the constitution and laws. Nor do the six defendants aver that any adequate or impartial remedy exists in any other court.

The threatened action of the six members being unauthorized by law and prejudicial to interests of the complainant and others in similar condition with him, a multiplicity of suits will be avoided by equitable relief, which is one of the heads of equity jurisdiction.

The complainant as clerk of the peace is especially and individually injured in his office and the enjoyment and usufruct thereof by his being subjected to severe pecuniary penalties if he should be compelled by the unlawful proceedings intended by the six defendants to abate or make default in his legal duties under the statute requiring him, under penalty, to omit no names from the assessment lists as returned by the assessors, in the duplicates he is required, as clerk of the peace, by law to certify and transmit to the officers charged with the collection of taxes; nor can he plead in his defense, in proceedings against him for such penalties, the unlawful orders or proceedings of the said Levy Court.

The complainant also as clerk of the Levy Court is individually and specially threatened with injury by the said proposed and intended actions of the said six members of the Levy Court, because he is morally and legally bound by law to perform official duties which will be invaded, impaired, and overthrown, and thereby great loss and irreparable injury will be inflicted on him, unless the said Levy Court shall be restrained by the injunction of this court.

The defense of want of jurisdiction should have been raised by demurrer, or by special plea. See 1 Dan. Ch. Pr. p. 608, and American *notes* and authorities there cited.

It is a rule that the Court of Chancery being a superior court of general jurisdiction nothing shall be intended to be out of its jurisdiction which is not shown to be so.

It is requisite in a plea to the jurisdiction of the court both to allege that the court has no jurisdiction and to show by what means it has been deprived of it. 1 Dan. Ch. Pr. 716 (*m*), and authorities cited.

And it is necessary to show what court has jurisdiction, and if the plea omits to set forth these particulars it is bad in form, and the plea to the jurisdiction must also show that the jurisdiction alleged to be entitled to exclusive cognizance of the suit is able to give a complete remedy. *Fox* v. *Wharton*, 5 Del. Ch. 210.

In Massachusetts and many other States the courts have not a general jurisdiction in equity. Dan. Ch. Pr. p. 609 (*m*), and cases cited.

It was decided in an elaborate review of the origin and history of the Court of Chancery in Delaware by the present chancellor, that it was a superior court of general jurisdiction, with all the powers of the High Court of Chancery of Great Britain.

That the court has undoubted jurisdiction to interfere by injunction where public officers are proceeding illegally or improperly under a claim to do any act injurious to the rights of others, — see *Cooper* v. *Alden*, Harr. Ch. 72, edited with *notes* by Thomas M. Cooley; see p. 91, and cases cited.

The case of *Cooper* v. *Alden* was brought by the private citizens in their own names, and not by the State upon their relation to obtain relief by injunction in chancery against public official commissioner of internal improvement.

That a private party may maintain a bill for an injunction who shows individual damage and may sue in his own name, see *Mississippi & M. R. Co.* v. *Ward*, 67 U. S. 2 Black, 492, 17 L. ed. 314. *Per Curiam:* "He seeks redress of a continuing trespass and wrong against himself, and acts in behalf of all others, who are or may be

injured; nor is there more necessity for joining with his partners in the prosecution than there is for his joining in the suit of any other person, as complainant, who has sustained injury." And the court remarks, a bill in equity to abate a public nuisance, filed by one who has sustained special damages, has succeeded to the former mode in England of an information in chancery prosecuted on behalf of the Crown, to abate or enjoin a nuisance as a preventive remedy.

That a court of chancery has an undoubted jurisdiction to interfere by injunction where public officers under claim of right are proceeding illegally or improperly to injure or destroy the property of an individual, or where it is necessary to prevent a multiplicity of suits, see *Mohawk & H. R. Co.* v. *Archer*, 6 Paige, 88, 3 L. ed. 910; *Livingston* v. *Livingston*, 6 Johns. Ch. 497, 2 L. ed. 196, 10 Am. Dec. 353. See also 3 Wait, Act. & Def. p. 700, and authorities cited.

" Trespass will now be enjoined in all cases where from the nature of the trespass, or from the circumstances of the parties, the remedy will not be full and adequate."

That a court of equity will not only interfere to restrain acts prejudicial to the interests of the community upon the information of the attorney-general, but also upon the application of private parties directly affected, aside from and independent of general injury to the public, see 3 Wait, Act. & Def. p. 707, and numerous authorities cited.

And where a bill in equity sets forth various claims and the defendant files a general demurrer, the demurrer will be overruled if any of the claims be proper for the jurisdiction of the court of equity. See 1 Dan. Ch. Pr. p. 608.

The State of Delaware has no statutes regulating the applications for remedies against the illegal and injurious acts of public officers.

As sustaining the right of the complainant to maintain this suit in the Court of Chancery, see also 1 High, Inj. §§ 796, 797, 801, 804, 822.

It is conceded that if the complainant be one of a class of persons who would sustain especial damages from the apprehended wrong, he may properly maintain this suit, and it being one of the heads of chancery jurisdiction to prevent a multiplicity of suits, it follows that the more extensive the class, the greater the multiplicity of suits to be prevented. Therefore, as the class of citizens to which the complainant belongs, *i. e.*, the assessed taxable citizens of the county who have the right to qualify themselves to exercise the elective franchise, comprises about 17,000 individuals, the reason for arresting an intended violation of a right or privilege so important to this large class is especially impressive.

And see latest edition of High on Injunctions, chapter on Taxation, sustaining the right of one or more taxpayers to maintain such an action as the present. *Christopher* v. *New York*, 13 Barb. 571.

*Charles B. Lore*, also for the complainant:

There are two material charges in the bill of complaint. The first is the unlawful putting on or adding to of names.

The answer practically disposes of that question, of the adding of names to the list.

The other charge made in the bill of complaint we apprehend is a substantial one and the one upon which this case turns.

Our charge is that defendants propose to strike from the list names under the guise of the word " legally." Their answer to that charge in the bill is that they propose to strike off names illegally appearing.

They distinctly claim the right and the power in their discretion to strike off names that they may judge are not legally placed thereon.

The 11th section of the answer of the respondents in this case raises the precise issue to be argued before this court, that is whether there is vested in the Levy Court, or a majority of the Levy Court, which is the Levy Court, in a certain sense, to strike off from that assessment list any names in their discretion other than those that are expressly provided by law if there be such.

We apprehend that the whole contention upon this point turns upon the Law of 1873, and as modified or amended by the Act of 1881, and perhaps it would be well enough for us to read that law.

Under the Act of Assembly passed April 9, 1873, as amended by Act of April 8, 1881 (vol. 16, Del. Laws, p. 306, § 6), it is provided as follows : " Be it further enacted as aforesaid, that it shall not be lawful for the Levy Court in either of the counties of this State, or any member thereof, to take from the assessment returned to the said Levy Court by any assessor, the name of any person *legally* appearing thereon ; nor shall it be lawful for such Levy Court, or any member thereof, to add to any assessment returned as aforesaid the name of any person, unless the party himself personally appears before the Levy Court, accompanied by some respectable freeholder of the county, who shall make oath or affirmation in the form prescribed in section 3 of this Act; said oath or affirmation shall be made in open court before the clerk of the peace, who alone is authorized to take an oath or affirmation for that purpose, and it shall be unlawful for the Levy Court to accept the oath or affirmation of any one taken before any other person than the clerk of the peace of the county in which the party applies for assessment; and an application made in any other manner than prescribed above shall be refused. It shall be lawful for the Levy Court to propound to the affiant such questions as they may deem proper concern-

ing his knowledge of the applicant, and if he should refuse to answer, they may reject the said oath or affirmation, and further that the Levy Court shall be the judges of the respectability of the affiant, and may reject the affidavit or affirmation of any person upon that ground : Provided, that persons regularly assessed in any hundred may, as under existing law, be transferred to any other hundred in the same county. Every member of the Levy Court of either of the counties of this State who shall violate the provisions of this section shall be guilty of a misdemeanor, and, upon conviction thereof, shall forfeit and pay a fine of not less than one hundred dollars nor more than five hundred dollars for every such offense. If the clerk of the peace shall neglect to place on the collector's duplicate for any hundred any name which may have been on the assessor's list for said hundred, delivered by the assessor to the clerk of the peace, he shall forfeit and pay to the person whose name shall have been so omitted the sum of ten dollars. Proceedings shall be before any justice of the peace, and the proceedings shall be in the same form as in actions for debt, and the assessor may be summoned as witness in said case and compelled to exhibit the certificate of assessment from the clerk of the peace."

Under this section it is claimed by a majority of the Levy Court, that they may in their pleasure strike off of the assessment lists returned to them by the respective assessors of this county on the first Tuesday of the present month, the names of any persons which they may think fictitious, the names of nonresidents and duplicate names; that this power is arbitrarily vested in them and may be exercised at any time before the first day of April, 1892. The extent of the power claimed is that they are the judges of what names shall be stricken off and that they can so strike off at their pleasure within the time named.

The Act of 1873 (vol. 14, p. 343, § 6), provides "that it shall not be lawful for the Levy Court, in either of the counties of this State, or any member thereof, to take from the assessment returned to the Levy Court by any assessor the name of any person appearing thereon."

The Act of 1881 (vol. 16, p. 306, § 6), amended the section by the insertion of the word "legally" so that it reads that the Levy Court are forbidden from striking off of such assessment the "name of any person legally appearing thereon."

It is contended by the majority of the Levy Court that the insertion of the word "legally" in this section clothes them with the extraordinary power and discretion of striking off names at their pleasure.

To understand this grave question properly, it will be wise for us to consider the purpose and history of the assessment lists, and of the functions, powers, and duties of the assessors, the Levy Court, the clerk of the peace, and of the collectors with respect to them.

The purpose of the assessment is twofold : (1) to form a basis of equitable taxation for the purpose of raising revenue for the support of the government. (2) it is a qualification for the exercise of the elective franchise. Section 1, article 4, of the Constitution of the State requires of the elector that he shall have, "within two years next before the election, paid a county tax which shall have been assessed at least six months before the election."

Involving, therefore, as they do, the right of the citizen to have a voice in making the laws under which he lives, the Legislature has carefully and jealously guarded the making, the alterations, and the custody of the assessment lists.

How carefully this has been done will appear from the laws applying to the persons who are clothed with any authority in respect to them.

*Assessors.*—These lists are made by an assessor who is elected by the people; he must be a freeholder in and an inhabitant of his election district (Code, p. 112, §§ 1–3), must not be a Levy Court commissioner, county treasurer, trustee of the poor, inspector, coroner, sheriff, member of the Legislature (Code, p. 82, § 20). Before entering upon his duties he is sworn by the Levy Court to make the assessment " fairly and impartially " (Code, p. 81, § 19).

It is his sworn duty to canvass his district, and fairly assess all taxable property and every taxable person, and to complete the assessment by the first day of January in each year (Code, p. 81, § 16).

Within ten days thereafter he must post in at least five of the most public places in his district an alphabetical list of the persons assessed, and at the same time, place and manner, giving notice that he will attend at the place of holding the general election in his district on a day named and such other days as may be necessary, from ten o'clock A. M. to five o'clock P. M., to correct errors and assess the names of any persons omitted (Del. Laws, vol. 16, p. 304, § 2).

At such times additions can be made on the affidavit of a respectable freeholder of the county, made before the assessor only, upon his appearance with the taxable, setting forth the identity, age, and residence of the omitted taxable, which affidavit the assessor shall return to the clerk of the peace (Del. Laws, vol. 16, p. 305, § 3). Such name, so vouched for, the assessor must put on list under penalty of from one hundred dollars to five hundred dollars. (Del. Laws, vol. 16, p. 305, § 4).

Any person who shall procure or cause to be put on the assessment list any name not entitled to be assessed, or a fictitious or fraudulent name, shall be guilty of misdemeanor, and fined from one hundred to five hundred dollars. (Del. Laws, vol. 16, p. 306, § 7.)

The assessor must return the assessment list so corrected by him to the Levy Court on the first Tuesday of February each year (Code, p. 81, § 17), under his certificates (Code, p. 85, §§ 3, 4), which are then to be kept by the clerk of the peace, who is the custodian of books and papers of court. (Code, p. 75, § 24.)

*Clerk of the Peace.*—After the assessment lists have been so returned to the Levy Court, and it has made the corrections and additions thereto which it deems just and proper, the clerk of the peace shall on or before the 20th day of February each year post in five of the most public places of each election district copies of the assessment with such corrections and additions, with notice of the day of holding Court of Appeals, which is the first Tuesday in March. (Code, p. 76, § 27.) On or before the first Tuesday of April in each year he also transcribes duplicates of the assessment lists for the collectors, and certifies to the correctness of the same. (Code, p. 64, § 18.)

It is expressly provided that "if the clerk of the peace shall neglect to place on the collector's duplicate for any hundred any name which may have been on the assessor's list for said hundred, delivered by the assessor to the clerk of the peace, he shall forfeit and pay to the person whose name shall have been so omitted the sum of ten dollars. (Del. Laws, vol. 16, p. 306, § 6.)

*Levy Court.*—Under the amended Code of 1874 and subsequent statutes, from the first Tuesday in February until the last day of March, the assessments are in the custody of the Levy Court for corrections and additions and transfers in pursuance of law.

At the February meeting the Levy Court may "examine, correct, and add to the assessments returned by the assessors." (Code, p. 62, § 9.)

At the March session they, upon their own examina-

tion, or upon appeal, have the power "to increase or diminish any assessment and to make additions to and corrections of the assessment list." (Code, p. 62, § 12.)

The Levy Court can only add to the list the names of persons who shall appear before them in open court personally with "some respectable freeholder" as a voucher, who shall make the affidavit required by law, and even when so vouched for he may be rejected, as the Levy Court is expressly clothed with authority to judge of and to reject the oath. (Vol. 16, p. 306, § 6.)

Nowhere in the code or in the subsequent statutes now in force is the authority directly given to the Levy Court to strike from the assessment list the name of a person duly returned therein by the assessor. Nor is any method designated by which such steps may be effected.

. If such power exists, it must be implied from the use of the word "legally" in the Act of April 9, 1873, amended by Act of April 8, 1881. (Vol. 16, p. 306, § 6.)

1. Such an implication is in the teeth of the legislation of the hundred years of our existence.

The first legislation on this point in our printed laws is the Act of February 9, 1796, where it is provided that "the commissioners of the Levy Court and Court of Appeals may, at their discretion, order any person's name to be struck off the levy list, that shall request it." (Vol. 2, p. 1262, § 32.)

This exact language is re-enacted in Act of January 19, 1797. (Vol. 2, p. 1329, § 8.)

The Act of February 4, 1825, which repealed most of the Act of January 19, 1797, left section 8 still in force, and it remained so until the Code of 1829 was compiled by *Judge* Hall. In this Code, section 8 of the Act of January 19, 1797, is published with the power to strike off names omitted. (Code 1829, p. 390, § 8.)

Under the Code of 1852 the Levy Court had authority

to strike from the assessment list, also from the collector's duplicate, the names of delinquents returned by the collector of taxes under oath, who were dead or had removed from the State; all others were to be entered on the collector's duplicate for the succeeding year. (Code 1852, p. 15, § 21; Code 1874, p. 65, § 21.)

By the Act of April 9, 1873, the Levy Court was absolutely prohibited from striking from the list returned to them the name of any person appearing thereon (vol. 14, p. 306, § 6), and the law so continued until the amendment of April 8, 1881, which added the word "legally," and made the section "any person legally appearing thereon," instead of "any person appearing thereon."

So that from the formation of our government there has been given to the Levy Court no express authority to strike a name from the assessment list returned by the assessor, except at the request of the person assessed, or on the sworn return of the collector showing delinquents, then in all cases the manner is specifically prescribed and set forth in the statutes. Nothing is left to implication but the duty and power of the Levy Court is explicitly limited and defined.

In the face of such circumspection on the part of the Legislature in limiting the power of striking names from the list, it would be an immeasurable stretch, even of the imagination, to construe the word "legally" in the Amendment of 1881, as conferring on the Levy Court such extraordinary power.

2. The Act of April 8, 1881, on its face negatives the implication of such a grant of power to the Levy Court.

The striking of the name of an elector from the assessment list is as important an exercise of power as adding a name thereto, and the Legislature would naturally be as explicit in the one case as in the other.

By section 6 of the Act (vol. 16, p. 306), where a

name is to be added to the list by the Levy Court, the applicant must appear personally in open court with his freehold voucher. The voucher must be sworn before the clerk of the peace only, and then it is " lawful for the Levy Court to propound to the affiant such questions as they may deem proper concerning his knowledge of the applicant, and if he should refuse to answer they may reject the said oath or affirmation, and further that the Levy Court shall be the judges of the respectability of the affiant and may reject the affidavit or affirmation of any person on that ground." Here the authority to judge is expressly conferred and the methods and means of using that great power are specifically provided and prescribed.

Yet under the contention of the respondents, the more dangerous power to strike names from the assessment list is conferred by the use of the word " legally " appearing thereon, without any express judicial authority, without any limitation of that power, and without any means by which it could be carried into execution, so that you must not only imply the power to strike off, but also the authority to judge, and all the means necessary to carry the same into effect.

Surely the absence of any express grant and provisions for striking off names, in the same section where the power to add names is so fully conferred in detail, is a violent presumption against any such intent on the part of the Legislature.

Again, by same section 6 the Levy Court is expressly clothed with judicial power as to adding names to the list. They may refuse to add the name of a person so claiming, and if they err they cannot be punished for the exercise of that judicial power.

They are not clothed with such express judicial power in the claimed authority to strike off names, and if, in

the exercise of their best judgment, they should strike off a name wrongfully they are guilty of a misdemeanor and punishable by a fine of one hundred to five hundred dollars.

We therefore would have the anomaly of an implied judicial power in the Levy Court to strike off names in their discretion, and yet incriminate and punish them if they make a mistake even in the use of their best judgment.

3. But an unanswerable argument against the implication of such a grant is found in the nature of the power claimed. If it exist at all it may be exercised by the Levy Court in their discretion up to and including the last day of March when the lists are finished and may not be altered or corrected in any respect; even in the last hour of the last day names may be stricken off as many and in such manner as the Levy Court may choose. Persons so stricken off would have no remedy and no redress; their names cannot be restored to the lists because it is then finally settled and the guilt of a misdemeanor and a fine of five hundred dollars awaits any one who shall add to or take from the list as so finally settled (Code, p. 63, §§ 14–16). Under the contention of the respondents the Levy Court would be acting judicially and could not be punished for any error.

Here you would have a citizen deprived of his most cherished right, by implication of law, and left absolutely without remedy or redress.

A startling consequence of such a construction of the use of the word "legally" in said section 6 would be that it practically annuls all the provisions of law for a fair and just assessment. What use is it for the assessor to canvass his district, faithfully assess all persons liable, to put his lists in five of the most public places in his district, to sit at the place of holding general elections for the correction and additions to his list, to return the

same to the Levy Court for correction and addition, for the clerk of the peace to post the lists so corrected, and for persons to appear both before assessor and Levy Court and have lists corrected, if on the last day of March the Levy Court in its sovereign discretion may strike from the lists such names as it may please? With this power the whole fabric tumbles, and the legislature in a moment of "idiotic simplicity" has wiped out the whole assessment system with its machinery and guards for the protection of the citizen. Such a contention is so monstrous that I can think of no language so fitted to designate such construction of the word "legal" as that it is merely a clinging to the bark and perpetrating a huge legal quibble and opening a veritable Pandora box of evil to the people. Certainly it has no savor of equity, and is in strictness purely technical.

4. If the word "legally" has any significance at all it relates only to such persons as the sworn returns of the collectors show are delinquents,—whom the Act of April 10, 1873 (vol. 14, p. 346, § 1), says "shall be dropped from the assessment list by the Levy Court and shall not be placed therein again for a period of twelve months after the date of such allowance." In that view it has no significance whatever since the repeal of sections 9 and 10 of the Act of April 9, 1873, by Act of May 13, 1891 (vol. 19, p. 78, § 1), which abolishes the delinquent list, and under the Five Commissioners Act (vol. 19, p. 63, § 8), all poll tax not paid by the first day of May next following the issue of the duplicates will be extinguished.

It must be borne in mind that the Levy Court is of limited jurisdiction, created by the Legislature; it has no judicial functions or authority except such as are expressly conferred, or necessarily implied.

In this view, what possible reason can be found for

clothing the Levy Court with such dangerous and unlimited power, dangerous in the hands of the purest and best, and in the hands of designing and corrupt men simply subversive of our dearest rights.

*W. C. Spruance*, for six of the defendants constituting a majority of the Levy Court of New Castle County:

This cause is heard upon bill and answer without replication or testimony.

If the plaintiff instead of replying to the defendant's answer sets down his case for hearing on bill and answer, the defendant is at liberty to read his answer as evidence in his favor in his own case, and the decree is made on the assumption that all the facts stated by the defendant are true. 1 Smith, Ch. Pr. 339; 2 Dan. Ch. Pr. p. 998.

We have thus eliminated from this case all disputed questions of fact and all allegations in the bill relative to the conduct of the Levy Court in the past, and all fraudulent purpose as to the future exercise of the powers claimed.

All fraudulent or unfair intent is denied in the answer, and must be accepted as true. Neither fraud nor carelessness in their proposed future actions can be presumed.

The only question before the court is whether it will enjoin the defendants from the careful, conscientious, and faithful exercise of the powers which we claim legally belong to them; and which we claim it is their duty to exercise.

Nor have we anything to do with any of the allegations in the bill in reference to the putting of names upon the assessment list, since the answer not merely denies any irregularity in that regard in the past, but declares the purpose to put no names upon the assessment list except in accordance with the plain directions of the statute, as to which there is no contention.

It should also be understood that the defendants do not claim for the Levy Court the right to make any change in the assessment lists made in former years as they stand in the court.

The question presented to your honor now is solely in reference to the rights of the Levy Court in respect to annual assessment lists returned this present year and which alone are during the months of February and March before the Levy Court for examination and correction.

But little light is thrown upon the subject by the examination of colonial statutes or later statutes down to the Code of 1852.

Section 32 of the Act of 1796 (2 Del. Laws, p. 1262), which declares that every freeman above the age of twenty-one shall be rated for a poll tax, and declares that the Levy Court commissioners "may at their discretion order any person's name to be struck from the levy list that shall request it," clearly means no more than this : That a person too poor to pay a poll tax might apply to the Levy Court to have his name stricken from the list so that he might thereafter live, as he might sue in this court upon proper application *in forma pauperis.*

This provision of the law, however, furnishes no light upon the questions now in controversy.

The statutes in force for many years down to the Act of April 9, 1873, have a most important bearing upon the subject now under consideration.

Down to the time of the passage of this Act it was, so far as I can learn, never questioned that the Levy Court, not merely by virtue of its general powers, but by express statutory provisions, had full power, not merely upon appeal, but upon their own examination, to correct and make additions to the assessment lists as returned by the assessors both in respect to persons and property.

I was myself counsel for the Levy Court of New Castle County from 1859 for about ten or eleven years, and I never heard the right of the Levy Court in this regard questioned; and I believe it to be true that during that time the Levy Court habitually exercised the right and duty not merely to add to said lists the names of such persons as had been improperly omitted, but to strike from the lists the names not properly appearing thereon, as for example, names duplicated on said lists; names which already stood upon the lists in former years as settled and then remaining in the Levy Court, and all fictitious names, and names of persons not resident in the hundred for which they were returned.

The following are some of the statutory provisions upon this subject found in the Revised Codes of 1852 and 1874.

Chapter 8, section 9.—"At the same meeting (February) they may examine, correct, and add to the assessments returned by the assessors. . . ."

Section 12. "They shall have power, either upon their own examination or upon appeal, to increase or diminish any assessment, and to make additions to and corrections of the assessment lists; to call before them any person whose name ought to be on the assessment lists, and who was omitted by the assessor or by the court at its former meetings, and to fix the poll assessment and make a valuation of property of said persons. . . ."

Section 13. "The said Levy Court shall have power to arrange all the assessments according to right and justice."

Section 14. "An assessment list shall not be liable to be called in question elsewhere than in the Levy Court, and the same, as it shall stand in said court, shall be absolutely conclusive."

Section 16. "If any person shall fraudulently add to

or take from the said assessments as finally settled by the
Levy Court, he shall be deemed guilty of a misde-
meanor. . . ."

Chapter 9, section 27. " After the Levy Court shall
have examined the returns made by the assessors and
made the corrections and additions thereto which they
deemed just and proper, he (the clerk of the peace) shall
make, and on or before the twentieth day of February,
in each year set up . . . an alphabetical list of the
names of persons with their respective assessments taken
from the assessment list of such hundred or election dis-
trict as the same shall stand after such corrections and
additions with notice of the day of holding the court of
appeal. . . ."

Chapter 11, section 4. " The return of the assessors in
the different hundreds in the State with such corrections
as the Levy Court shall make, shall be a part of the as-
sessment list of said hundred, and shall be conclusive."

Under these provisions of law as they existed prior to
the Act of 1873, the right of the Levy Court to strike
from the lists returned by the assessors fictitious names,
duplicated names, names of persons already assessed,
names of persons not resident in the hundred or district,
was unquestioned and unquestionable.

The right thus given to the Levy Court was not merely
to correct errors in names, but to make additions to and
corrections of the assessment lists.

It may be fairly inferred from the provisions found in
the Act of 1873 that it had theretofore been the habit of
the Levy Court to exercise the powers which we now
claim it had the right to, both as to the adding of names
and the taking of names from the assessment lists as re-
turned by the assessors, since we find by an examination
of the Act of 1873 that its provisions were in a large
degree directed to the defining and curtailing the powers
of the Levy Court in this regard.

This Act prescribed with greater precision the duty of assessors in making assessments, provided a penalty for his refusal or omission to place upon the assessment the name of any person personally appearing before him and vouched for as prescribed by the Act, and for his knowingly placing on the list any fictitious name, or the name of a person not at the time resident of the hundred or district, forbade the assessors and Levy Court to place upon the assessment the name of any person, who having failed to pay the tax assessed against him for the preceding year, had been returned and allowed as delinquent, until the expiration of twelve months from such allowance as delinquent.

Section 6 prohibited the Levy Court from taking from the assessment list returned by any assessor the name of any person appearing thereon, and forbade them to add to any assessment list so returned the name of any person except upon his personal appearance and proof as required by the Act, transfers excepted.

This section curtailed the powers of the Levy Court materially ; and while it might be contended that it did not prohibit the removal of fictitious names which would not be the names of persons, it might have been dangerous for them to strike off any name, even though fictitious, appearing upon the lists returned by the assessors.

Whatever may have been the purpose of this provision it became in its operation an invitation to assessors for partisan purposes to pad the lists with fictitious names, duplicated names, names of nonresidents, and names of persons already assessed ; and it is notorious that during the period that this provision was in force this invitation to fraud was freely accepted by unscrupulous assessors.

This evil was to a great degree remedied by the Act of April 8, 1881 (16 Del. Laws, 302), which among other amendments of the Act of 1873 struck out all after the

word "that" in the first line of section 6 and before the word "provided" in the tenth line of said section, and inserted in lieu thereof, among other things, the following: "It shall not be lawful for the Levy Court in either of the counties of this State, or any member thereof, to take from the assessment returned to the said Levy Court by any assessor, the name of any person legally appearing thereon;" and prescribed the mode by which the Levy Court might add to any assessment returned as aforesaid the name of any person.

The question now before the court is : What was the effect of the Act of 1881 in striking out the prohibition against taking from said lists "the name of any person appearing thereon" and the substitution of a provision which merely prohibited them from taking from said list "the name of any person legally appearing thereon ?"

What names could and what could not legally appear upon a list returned by an assessor in a year as this is of an annual assessment ?

The classes of persons whom the assessor should or could place upon his annual assessment list for poll taxes were defined and prescribed by chapter 11, section 3, of the Revised Code, and were and are as follows: "(1) Those who have arrived at twenty-one years of age since the preceding assessment; (2) those who have come to reside in the hundred or district; and (3) those who have been omitted from prior assessment.

This provision of the law has by no subsequent legislation either been repealed or altered in any manner.

The names of persons other than those to be found in one of these classes could not legally appear upon an assessor's annual list.

The methods by which the assessors should proceed in reference to these classes of persons have been by subsequent legislation changed and defined, and penalties pre-

scribed for violation of duty by the assessor, but these classes have always remained the same.

None of the provisions of law to which I have referred, namely, Rev. Code, chap. 8, §§ 9, 12, 13, 14, 16; chap. 9, § 27; chap. 11, § 4, conferring express power upon the Levy Court, either upon their own examination or appeal to make additions to and corrections of assessment lists returned by the assessors,—have been repealed by subsequent legislation, and they stand in full force to-day, except so far as those powers may have been modified by subsequent legislation.

And it is incumbent upon our opponents to show by what statutes and to what degree the powers enjoyed by the Levy Court under the above-mentioned provisions of the Revised Code have been modified or qualified.

The restrictions of the Act of 1873 upon the power of the Levy Court as to the adding of names remains substantially the same under the Act of 1881, but the substitution for the prohibition against taking from said lists the name of any person appearing thereon in the Act of 1873 of the prohibition against taking from said lists the name of any person legally appearing thereon, has resulted in an enlargement of the powers of the Levy Court and a restoration to them of the powers which they enjoyed in this regard under the before-mentioned provisions of the Revised Code.

Before the Act of 1873, under the express and implied powers of the Levy Court then existing, they certainly had no right to take from the lists returned by the assessors " the name of any person legally appearing thereon," and if they had done so it would have been an illegal act and in violation of their oaths of office, although there was no express penalty for their so doing.

The Amendment of 1881, while it expressly forbids the taking from the lists " the name of any person legally

appearing thereon," and prescribes a penalty for so doing, does not make the Act more illegal that it would have been under the Acts in force prior to the Act of 1873.

The limiting of the prohibition to "the name of any person legally appearing thereon" implies that they should thereafter have the right to take from said lists the name of any person not legally appearing thereon; and if there were no other provisions of law which expressly or impliedly gave this power to the Levy Court, the Amendment of 1881 by fair implication conferred this power upon the Levy Court.

But the Act of 1881 did more; it took away the modifications under the Act of 1873 of the powers of the Levy Court in respect to the taking off of names under prior and unrepealed statutes, and all such statutes thereafter were in full force and effect in that regard.

If we are right in the contention that the Levy Court, under the statutes in force prior to 1873, had the right to take from the lists as returned by the assessors the names of persons not legally appearing thereon, they have now that right by virtue of the Act of 1881 under the statutes in force prior to 1873.

It is not to be presumed that the Legislature made the Amendment of 1881 without any intention whatever. It is manifest that they intended to make a change in the unqualified prohibition in the Act of 1873 which forbade the Levy Court to take from said lists the name of any person appearing thereon.

If such was not the intention of the Amendment of 1881, what was its intention? Why was there any change made in the Act of 1873 in this regard?

Manifestly the Legislature considered that the prohibition against taking off the name of any person appearing thereon was too broad and was dangerous in its effects, and that the prohibition should be made in respect only to taking off names not legally appearing thereon.

It is a rule of construction that a statute must be construed so as to give effect to the intention of the Legislature. If the contention of our opponents is to be sustained, then we must conclude that the Legislature in this regard made no change whatever in the law, and that what they did was without any intention whatever.

It is claimed that the only class of names to which this provision of the Act of 1881 applies is to persons returned as delinquents who by the 9th section of the Act of 1873 were forbidden to be placed upon the assessment list for twelve months after the time of their allowance as delinquents; but the same Act by forbidding the placing upon the assessment list of sundry other classes of persons, and prescribing penalties for so doing, make it equally illegal to place such persons upon the lists ; as for example said Act forbids under penalty the assessor to place upon the list the name of any poll taxable unless the assessor shall be satisfied from personal knowledge that such person is of lawful age and *bona fide* resident in the hundred or district, except such as shall personally appear before him and prove in the manner prescribed by the Act that he is entitled to be placed thereon.

Section 3 forbids him under penalty to place upon the list any fictitious name or the name of any person not at the time a resident of his hundred or district.

Section 7 forbids any person under a penalty to cause to be placed upon the list of any hundred or district the name of a person not entitled to be assessed in said hundred or district, or any fictitious or fraudulent name.

The placing upon the list of any name by either of these provisions forbidden to be placed upon the list was equally illegal as the placing thereon of delinquents mentioned in section 9 of the Act. But section 9 of said Act was repealed by the Act of 1891 and there is now left according to the contention of our opponents nothing

upon which the Amendment of 1881 can now operate, and that as the law now stands all names which may appear upon said lists whether they be of persons already assessed, of persons who do not live in the hundred or district, of persons appearing many times on said list, or of wholly fictitious persons, appear on said list legally, and cannot by any power be removed therefrom.

The Act of 1881 was not, as is contended on behalf of the complainant, a restrictive Act, but strictly construed it was an enlarging Act. The Act of 1873 forbade the taking off of any names appearing thereon. The Amendment of 1881 was in effect an Enlarging Act in that it diminished the prohibition and made it applicable only to those legally appearing thereon.

The provision of section 6 of the Act of 1873 which was not in express terms repealed or changed by the Amendment of 1881 which prescribes a penalty for the clerk of the peace neglecting " to place on the collector's duplicate for any hundred any name which may have been on the assessor's list of said hundred, delivered by the assessor to the clerk of the peace," is claimed by our opponents as proving conclusively that the Levy Court do not possess the power to remove any names from said list however illegally placed thereon.

They admit of course that while section 9 of said Act stood, the clerk of the peace had no right to place upon the collector's duplicate any name which had been allowed as delinquent, although such name may have been on the assessor's list; but the language of this recited provision, read literally, absolutely forbids the clerk of the peace to neglect placing on the collector's duplicate any name which may have been on the assessor's list, and makes in terms no exception whatever. But of course no such cast-iron construction should have been given to this provision and certainly not since the Amendment of 1881.

This provision of the Act of 1873 may in one sense be said to have there a proper place and meaning, as that Act forbade the Levy Court in the exercise of their supervisory power over the list or otherwise taking from the list the name of any person appearing thereon; but when that provision is found remaining as a part of section 6 as amended in 1881, it must be read and construed in reference to the main purpose of the amendment and the general scope and purpose of the Act as amended, which was so far as related to the taking of names from the list to prohibit only the taking off of names legally appearing thereon. If not so construed this provision as to the clerk of the peace would defeat the very object and purpose of the amendment, but this cannot be allowed.

We must by the proper rules of construction make, if we can, the whole Act harmonious and consistent and not defeat its plain and main purpose by a minor provision which read literally may appear inconsistent.

If this provision is to be taken literally, from the passage of the Act of 1873 to the passage of the Act of 1891, it was the duty of the clerk of the peace to put upon the collector's duplicate names found upon the list returned by the assessors, which within twelve months had been allowed as delinquents. If taken literally the clerk of the peace would have been obliged to put on the duplicate names which by a third party, and without the knowledge of the assessor, might have been illegally added to it after its completion by him and before its return to the Levy Court, and thus defeat the action of the Levy Court, however wisely and legally exercised in taking from said lists names not legally appearing thereon.

It is contended, on the other side, that the effect of the Acts of 1873 and 1881 in adding any safeguards in

the putting on of names by assessors, and the Levy
Court, implies a denial of the right of taking off.    It
appears to us that the inference to be drawn from these
provisions is an intention to secure true lists,which would
be impossible if there is nowhere the power to take off
names which are false or fraudulent.

The Levy Court is a governing body of limited juris-
diction and has only such powers as are either conferred
expressly or arising by proper and necessary implication
from other powers expressly conferred, or from the con-
stitution and the purposes for which the body was cre-
ated; but within their legitimate bounds in the honest
and faithful exercise of the powers which the law has
conferred upon them they have a discretion which can-
not be interfered with or enjoined by this court.

The answer declares that it is the purpose of the de-
fendants to exercise the power and discretion which law-
fully belongs to them fairly and impartially, and we must
take this to be true.

In purging the lists of names not lawfully appearing
thereon, not only would the Levy Court be exercising
the powers which the law confers upon them, but there
would be no serious difficulty in so doing.

Although not learned in the law we may presume that
the average Levy Court commissioner has as much intel-
ligence and capacity for reaching a just conclusion as the
average referee or juryman.    And it is upon the deter-
mination of juries that we depend for the settlement of
the most ordinary as well as the most difficult questions
of fact in controversy between the citizen and the State,
as well as between citizen and citizen.

In the exercise of their power and duty " either on
examination or on appeal" to correct the assessment lists
the law has clothed them with full powers.    They may
summon before them and examine under oath the assess-

ors or any other persons. The assessor when so examined cannot plead ignorance.

By the Act of 1873 as amended by the Act of 1881, the assessor is not allowed to place on his list any person for poll tax only except such as he shall be satisfied from personal knowledge is of lawful age and is a *bona fide* resident of the hundred or district, except such as apply in person, and furnish proof of their identity, age, and residence by affidavit in writing, which affidavit is to be returned with his list.

If a name appears upon the assessment lists which is claimed to be fictitious, the assessor can be called upon to indicate the place of his residence, or if it was placed upon the list upon personal appearance and affidavit, the affidavit and voucher can be produced and the voucher himself summoned before the court. And by this and similar methods the Levy Court may proceed speedily and with certainty to ascertain whether any and what names do not legally appear upon said lists.

It would be difficult to exaggerate the inconvenience and danger which must arise if this power is denied to the Levy Court.

Our opponents tender themselves ready to join us in purging these lists if, as is claimed, some of them are padded with unlawful names.

We are glad to accept their offer of co-operation and ask them how they propose to purge these lists if the Levy Court cannot do it as we propose. To this inquiry we have no answer. We know no other method; if the Levy Court cannot take off fictitious and fraudulent names, duplicated names, names of persons not entitled to be thereon, we do not know and our opponents have not told us, how this may be done.

The collector upon whose duplicate must go all fictitious names and duplicated names, if the claim of our

opponents is correct, may, as has been decided by the courts of this State, not require the personal appearance and payment by the alleged taxable, but he may in his discretion hand over to any person who will produce the money regular receipts for the taxes of all such fictitious or fraudulent names.

If these names not lawfully appearing upon these lists cannot be removed therefrom by the Levy Court the most hopeless confusion and uncertainty must ensue in laying the taxes for the coming year and for the years to follow until the next general assessment. But of vastly more importance is the consequence sure to follow of frauds against the right of suffrage.

Of what consequence is it that every man lawfully entitled to vote shall vote if a sufficient number of those not entitled to vote shall be allowed to vote and thus overcome the will of the lawful electors?

"We call the attention of the court to the fact that both the prayer for injunction and the restraining order issued in this cause calls upon the defendants to refrain not merely from taking from the lists returned by the assessors any name lawfully appearing thereon in accordance with the provisions of the Act of 1881, but in accordance with the repealed provision of the Act of 1873 restrains the defendants from taking from said lists any name whatever appearing thereon, which is not now and has not been since the Act of 1881 in accordance with the laws of this State."

The thirteenth paragraph of the answer denies the right of the complainant to bring or maintain this suit as a citizen taxable and resident of New Castle County, as clerk of the peace, clerk of the Levy Court, or in any of said capacities, either in his own behalf or in behalf of other taxables, citizens of said county.

"Where, however, the bill is filed on behalf of private

citizens to restrain a public nuisance, they must show some special and peculiar injury sustained by themselves, independent of and distinct from the common and general injury shared by the public alike, in default of which equity will not interfere." High, Inj. § 755.

"Where the act which it is sought to enjoin is one which affects the interest of the public at large, proceedings for an injunction are usually brought, both in England and in the United States, in the name of the people, or of the attorney-general at the instance of a relator." High, Inj. § 747; *Baines* v. *Baker*, Ambl. 158.

This was a bill for an injunction to stay building a hospital for people infected with the small-pox in cold bath fields very near the homes of several tenants of the plaintiffs. The lord chancellor says : " Bills of this sort are founded on being a nuisance at common law. If a public nuisance, it should be on information in the name of the attorney-general, and it would be for his consideration whether he should file such an information or not." In conclusion the lord chancellor says : " I am of the opinion I should not be justified in granting the injunction which is now prayed, and therefore must deny the motion."

In *Crowder* v. *Tinkler*, 19 Ves. Jr. 622, the court says : " Upon the question of jurisdiction, if the subject was represented as a mere public nuisance, I could not interfere in this case, as the attorney-general is not a party ; and, if he was a party, upon the *dicta*, unless it was clearly a public nuisance, generally, the court would not interpose by injunction, until it had been tried at law." *Davis* v. *New York*, 14 N. Y. 526, 67 Am. Dec. 186; *People* v. *Vanderbilt*, 28 N. Y. 397, 84 Am. Dec. 351.

*Putnam* v. *Valentine*, 5 Ohio, 187, was a bill brought for injunction by the surveyors of a public road to prevent obstructing the same. Held, by the court, that suits

to prevent the infraction of rights purely public are generally brought and conducted in the name of the State, or the officer entrusted with the conduct of public suits.

And again, the individual complainant has no such interest or connection with the subject of this bill as to entitle him as such to the relief prayed for.

It follows that the injunction asked cannot be granted on this application.

*Miller* v. *Grandy*, 13 Mich. 540, was a case of a bill for injunction by a citizen and taxable against a board of county commissioners corresponding, as I understand, with our Levy Court, to restrain them from appropriating and expending money for the payment of bounties, etc., during the late war. Held, that the complainant in his capacity as a citizen and taxable had no right to maintain such a suit, and that it should have been brought in the name of the attorney-general or the State upon the relation of some proper person. Injunction refused.

I state the decision in this case from my recollection, as I have not now the volume before me.

In all similar cases in this State, of which I have any knowledge, the proceeding has been instituted either in the name of the State upon the relation, etc., or in the name of the attorney-general upon the relation, etc.

I remember an information filed by me shortly after *Chancellor* Bates came upon the bench in the case of John B. Pennington, attorney-general, upon the relation of Sharp, Stotsenberg, and others, citizens and taxpayers, etc., against the City Council of Wilmington, to restrain them from the expenditure of money and the incurring of debt for the purpose of public park lands without warrant of law.

All cases of mandamus and quo warranto relating to similar subjects have been brought in like manner.

If the complainant has a special and particular interest

in the subject-matter of the suit over and above the common interest of other citizens, taxpayers and voters, he may maintain a bill.

We fail to see that in either of these capacities, or in his capacity of clerk of the peace and *ex officio* clerk of the Levy Court, he has any special right, or that he is in any special danger.

Nothing will be required of him except the performance of those duties which the law enjoins upon him, and the obedience of those orders of the Levy Court which he is sworn to obey.

For these reasons we ask that the bill be dismissed.

*Edward G. Bradford,* also on behalf of the six defendants constituting the majority of the Levy Court:

This case having been heard on bill and answer, all allegations of fact contained in the answer are admitted to be true and only such allegations of fact in the bill as are not controverted by those in the answer are taken to be true; all the other allegations of fact in the bill being taken to be untrue.

All of the facts, then, which can be considered by the chancellor are those set forth in paragraphs 6 and 11 of the answer.

The question thus presented is simply whether this court has power and jurisdiction to interfere with the action of the Levy Court in striking off of the lists returned by the assessors fictitious names or other names illegally appearing thereon.

The Levy Court has sole jurisdiction and power in the premises and in the absence of fraud on its part there is no jurisdiction or power in the Court of Chancery to interfere with the action of said Levy Court.

High says: "No principle of equity jurisprudence is better established, than that courts of equity will not sit in review of the proceedings of subordinate political or

municipal tribunals, and that where matters are left to the discretion of such bodies the exercise of that discretion in good faith is conclusive, and will not, in the absence of fraud, be disturbed." High, Inj. § 785.

And again, the same author says: "Equity will not interfere by injunction for the purpose of controlling the action of public officers constituting inferior quasi judicial tribunals, such as boards of supervisors, commissioners of highways, and the like, on matters properly pertaining to their jurisdiction, nor will it review and correct errors in the proceedings of such officers, the proper remedy, if any, being at law, by writ of certiorari." High, Inj. § 797.

In *Mooers* v. *Smedley*, 6 Johns. Ch. 28, 2 L. ed. 43, cited in *note 2*, § 797, of High on Injunctions, *Chancellor* Kent says: "I cannot find by any statute, or precedent, or practice, that it belongs to the jurisdiction of chancery as a court of equity, to review or control the determination of the supervisors in their examination and allowance of accounts and causing the money to be raised. . . . The review and correction of all errors, mistakes, and abuses in the exercise of the powers of subordinate public jurisdictions and in the official acts of public officers belongs to the Supreme Court. . . . It has always been a matter of legal and never a matter of equitable cognizance."

Under the statutes of the State of Delaware not only is the settlement of the assessment lists committed to the Levy Court, but the law expressly declares that " an assessment list shall not be liable to be called in question elsewhere than in the Levy Court; and the same, as it shall stand in said court, shall be absolutely conclusive." Rev. Code, chap. 8, p. 63, § 14.

It is therefore clear that the Court of Chancery has not the power to interfere with the action of the Levy

Court in matters pertaining to its jurisdiction, such as the settlement of the assessment lists, in the absence of fraud on the part of the latter body.

Upon the admitted facts the Levy Court has the right to do what it proposes.

It is the purpose and intention of the Levy Court to strike off of the lists returned by the assessors only such names as the Levy Court shall on due examination ascertain to be fictitious or otherwise illegally placed on said lists.

This the Levy Court not only by the general nature and purpose of its being, but also by direct statutory authority, has the right to do.

The Levy Court is a quasi judicial body with large discretionary powers charged with the raising and expenditure of the county revenue.

The raising of the revenue involves the making of an assessment of polls and property, and the adjustment of the tax rate by the Levy Court requires a true and reliable assessment.

The assessors primarily in point of time engage in the work of assessment and return their lists to the Levy Court; but the process of assessment is not complete until the assessment lists so returned pass through the Levy Court receiving its examination, revision, and correction, and the addition by it to the lists of names of such persons as should have appeared but were omitted therefrom.

The assessment lists as so settled by the Levy Court by the last day of March of the year in which the assessors make their returns, are final and conclusive, save as to the right of appeal in certain cases not affecting the discussion of the present case.

Upon these lists as so settled the Levy Court adjusts the tax rate at such a percentage as will be sufficient to produce the requisite amount of public revenue.

The proposition advanced by the counsel for the complainant is virtually that if an assessor places fifty thousand fictitious names, by way of illustration, upon the assessment list returned by him to the Levy Court that body would be utterly without power to strike these names from the list and remedy the fraud. And if the Levy Court cannot strike these fraudulent names from the lists there is no power in any human tribunal to do so.

If the contention of the other side be sound our legislation upon the subject is a reproach to our age and civilization.

And it is confidently submitted that such contention is unwarranted by the law.

For the purpose of ascertaining the authority of the Levy Court to strike off from the lists as returned by the assessors fictitious names and other names illegally placed, thereon it is highly important to consider the condition of the old law, and by old law is meant the law as it existed prior to the Act of April 9, 1873.

Under the old law there could be no reasonable doubt of the power of the Levy Court to do what it now proposes ; and notwithstanding the assertion of the counsel for the complainant to the contrary, it was the practice of the levy courts of the different counties in settling the assessment lists returned to them to strike off names illegally appearing thereon.

The law clearly recognized that it was the Levy Court and not the assessor that had the final settlement and determination of the assessment lists.

The counsel for the complainant have argued the case apparently upon the assumption that the assessor is the superior of the Levy Court; and that if fraud is to be apprehended it is to be looked for on the part of the Levy Court rather than the assessor.

The law does not presume that any public officer sworn

to fidelity will be derelict in his duty, whether he be an assessor or a member of the Levy Court.

But the Levy Court has higher authority and more extensive power than the assessor.

It is the revisory, corrective, and appellate tribunal and performs the final functions of the assessment machinery, of which the assessor is but a part.

Section 4, chap. 11, page 85, Rev. Code, provides that, " the return of the assessors in the different hundreds in the State with such corrections as the Levy Court shall make, shall be a part of the assessment list of said hundred, and shall be conclusive."

Section 14, chap. 8, page 63, Rev. Code, provides that, " an assessment list shall not be liable to be called in question elsewhere than in the Levy Court; and the same, as it shall stand in said court, shall be absolutely conclusive."

Section 16, chap. 8, page 63, Rev. Code, provides that, " if any person shall fraudulently add to or take from the said assessment, as finally settled by the Levy Court, he shall be deemed guilty of a misdemeanor, and shall be fined five hundred dollars."

While the assessor is an officer chosen by the people and clothed with his appropriate functions, he is nevertheless in the discharge of those functions, subject to the superior power of the Levy Court in the settlement of the assessment lists, for the purpose of furnishing a reliable basis for the adjustment of the tax rate.

The law recognized that the assessor was liable to commit errors and mistakes, for it provided that before he should return his assessment list to the Levy Court he should sit " to correct any errors therein, or for the purpose of assessing persons omitted." Rev. Code, chap. 10, p. 81, § 16.

And this duty of sitting for the correction of errors

in his assessment list, or the addition of names thereto, is devolved upon the assessor under existing law.    Del. Laws, chap. 320, p. 304, § 2.

It has not been contended by the counsel for the complainant that the assessor, after hanging up his list in the month of January, and before making return thereof to the Levy Court on the first Tuesday of February of the same year, would not have the power to strike therefrom any fictitious names, or any other names illegally placed thereon.    Yet in so doing he would be exercising only the power of correcting his list.

But it is contended that after his list is once returned to the Levy Court, it is absolutely final, so far as the striking of illegal names therefrom is concerned.

It is the duty of the assessor to return his assessment to the Levy Court on the first Tuesday of February, and to attend the Levy Court on that day, on the first Tuesday of March, and on such other days as the Levy Court may require, under a penalty.    Rev. Code, chap. 10, p. 81, § 17.

After the assessor makes his return to the Levy Court on the first Tuesday of February, the Levy Court, as the revisory, corrective, and superior power, examines, corrects, and adds to the list as returned by the assessor, and in the discharge of that function can require the assistance of the assessor.    Rev. Code, chap. 8, p. 62, § 9.

And in the month of March the Levy Court, either upon its own examination or upon appeal, was expressly authorized " to increase or diminish any assessment, and to make additions to and corrections of. the assessment list ; to call before them any person whose name ought to be on the assessment list, and who was omitted by the assessor or by the court at its former meetings."    Rev. Code, chap. 8, p. 63, § 12.

It is a monstrous proposition that the Levy Court,

clothed with this power, had not the right, for the purpose of settling a true basis for the adjustment of the tax rate, to strike from the list required to be submitted to it for its revision and correction fictitious names and other names illegally placed thereon.

When the assessor makes his return to the Levy Court, on the first Tuesday of February, his primary functions of assessment cease, and the revisory and corrective functions of the Levy Court come into play.

That the Levy Court had the right to strike from the lists fictitious and illegal names, resulted from the general scope of the functions of that body, and from the power expressly conferred upon it to examine and correct the lists.

The Levy Court was empowered to add names to a list perfect in itself so far as it extended, and to correct lists in so far as they were imperfect and illegal.

No one questions the right of the Levy Court, in case John Smith was assessed by the assessor as Thomas Smith, to strike out the name " Thomas," and insert the name " John." Yet this is identically the same in principle with striking from the list a fictitious name. The Levy Court had the right to strike out the name " Thomas " and insert the name " John," in order that there should appear on the assessment list the name of a person who should be assessed with and pay a tax. And in striking out the name " Thomas," it dropped from the list just so much of a name as was fictitious and did not represent a person from whom a tax could be collected. Upon precisely the same ground it had the right to strike out a wholly fictitious name as not representing any taxable.

To contend that under an express power conferred upon the Levy Court to correct the lists as returned by the assessor, it is not authorized to strike therefrom ficti-

tious names and names of persons illegally placed thereon, is manifestly taking too narrow a view of the power conferred upon the Levy Court to adjust and settle the assessment lists in such manner as to serve as a reliable basis for the adjustment of the tax rate.

This will be made further apparent by consideration of the functions and limitations upon the power of the assessor under the law in making an annual assessment, the assessment of 1892 being an annual, and not a general, assessment.

Section 2, chap. 11, page 85, Rev. Code, provided that the general assessment "shall stand and be acted on for four years."

Section 3 of the same chapter, page 85, Rev. Code, contains a proviso that "each assessor shall annually assess the persons of those liable, who have arrived at twenty-one years of age since the preceding assessment, or who have come to reside in the hundred, or who have been before omitted."

Thus the power and authority of the assessor in making an annual assessment, aside from property, are strictly limited to assessing three classes of persons : (1) persons who have arrived at twenty-one years of age since the preceding assessment; (2) persons who have come to reside in the hundred; (3) persons who have been before omitted.

The old law therefore as it now remains in force excludes and expressly negatives any legal power in the assessor to place fictitious names upon his list, for they do not represent persons; or to place upon his list the names of any persons who do not reside in the hundred, or, under existing law, the assessment district, for they have not come to reside in the hundred or assessment district; or to place upon his list the names of any persons already duly assessed, for such persons have not

been omitted; or to duplicate upon his list any names, for the same reason.

Such being the law the Levy Court under its express power of correcting the lists clearly had the right to strike therefrom any and all such names, to the end that the assessment list as finally settled should furnish a reliable basis of taxation.

It has not been denied by the counsel for the complainant that the assessor after completing his assessment by the first Tuesday in January and hanging up his list within ten days thereafter as required by law, and before returning his list on the first Tuesday in February had and has the right to correct the names appearing thereon and to strike fictitious names therefrom and other names illegally appearing thereon.

Yet this right on the part of the assessor is included in his express power " to correct any errors therein or for the purpose of assessing persons omitted," as set forth in section 16, chapter 10, page 81, Revised Code.

If, then, the assessor under the power to correct errors in his assessment list had and has the right to strike fictitious names therefrom as well as other names illegally appearing thereon, the Levy Court necessarily has equal power to strike from the list as returned by the assessor on the first Tuesday of February fictitious names and other names illegally appearing thereon; for it is authorized by section 9, and section 12, chapter 8, Revised Code, either upon its own examination or upon appeal " to make additions to and corrections of the assessment list and to call before them any persons whose names ought to be on the assessment list and who were omitted by the assessor or by the court at its former meetings."

The power conferred upon the Levy Court over the list as returned by the assessor being identical in substance and form with the power conferred upon the assessor over his own list before returning it to the Levy

Court on the first Tuesday in February, there can be no justification for a denial to the Levy Court of the authority to strike from the list fictitious names and other names illegally appearing thereon.

Several statutory enactments passed, during the last century which authorized the Levy Court upon the application of the poll taxable to strike his name from the list, were referred to by the counsel for the complainant in support of their contention; and it was argued by them that as that power formerly existed and had since been abolished there is now no authority in the Levy Court to strike names from the list. But the statutory enactments referred to have no conceivable application to the present case for the reason that they dealt solely with legal assessments of poll taxables who desired to be relieved from the payment of a tax, and not illegal assessments by way of fictitious names or names unlawfully appearing on the list.

Thus up to the passage of the Act of April 9, 1873 (page 82, Revised Code), there could be no question that the Levy Court had full authority under its power of correction to strike from the assessment list when returned fictitious names and other names unlawfully appearing thereon.

But by section 6 of the Act of April 9, 1873 (page 83, Revised Code), it was provided that "it shall not be lawful for the Levy Court, in either of the counties of this State, or any member thereof, to take from the assessments returned to the said Levy Court by any assessor, the name of any person appearing thereon; . . . and if the clerk of the peace shall neglect to place on the collector's duplicate for any hundred any name which may have been on the assessor's list for said hundred, delivered by the assessor to the clerk of the peace, he shall forfeit and pay to the person whose name shall have been so omitted the sum of ten dollars."

The Act of April 9, 1873, was a clear legislative recognition of the right of the Levy Court prior to its enactment to strike names from the list under its power of correction; otherwise there could have been no necessity or reason that the Legislature should declare that the Levy Court should not thereafter have that right.

But section 6 of the Act of April 9, 1873, did unquestionably render it unlawful for the Levy Court or any member thereof on behalf of the court to strike from the list as returned by the assessor the name of any person whether legally or illegally appearing thereon.

Yet even under the Act of April 9, 1873, the Levy Court was not deprived of the power to strike fictitious names from the list as returned by the assessor.

Thus the law remained until the Act of April 8, 1881 (p. 302, vol. 16, Del. Laws), was passed amending the Act of April 9, 1873. Before the passage of the Act of 1881 it had become evident that the sweeping prohibition against the removal of the names of any persons from the assessors' lists contained in section 6 of the Act of April 9, 1873, was unwise and directly calculated to encourage and shield fraud on the part of the assessors in making up their lists.

The Act of April 8, 1881, was passed to correct this evil. Among other things it struck out of section 6 of the Act of April 9, 1873, the words, "It shall not be lawful for the Levy Court, in either of the counties of this State, or any member thereof, to take from the assessment returned to the said Levy Court by any assessor, the name of any person appearing thereon;" and in lieu of the words so stricken out were inserted the words, "It shall not be lawful for the Levy Court, in either of the counties of this State, or any member thereof, to take from the assessment returned to the said Levy Court, by any assessor, the name of any person legally appearing thereon."

The Legislature must be held to have intended to accomplish some result by this change ; and it is inconceivable that they could have intended anything else in making the change than to empower the Levy Court to exercise the same authority which rightfully belonged to it before the Act of April 9, 1873, to strike from the assessors' list fictitious names and other names unlawfully appearing thereon. To argue to the contrary is simply to assume that the Legislature stultified itself.

The proposition of the counsel for the complainant that according to the contention of the counsel for the defendants, any member of the Levy Court as an individual would have a right to strike from the assessments such names illegally appearing thereon is absurd and does not merit a serious reply.

The Legislature, by the Act of 1881, having thus clearly authorized the Levy Court in the exercise of its power to correct the assessment list to remove names illegally appearing thereon, and not having re-enacted the provision of the Act of April 9, 1873, relating to the clerk of the peace, that provision by a reasonable and indeed necessary implication was either repealed or modified in such manner that the clerk of the peace could only be visited with a penalty for omitting from the collector's duplicate names appearing on the assessment list as revised, corrected, and settled by the Levy Court.

Since the Act of 1881 the Levy Court has possessed full power to strike from the assessor's lists all names which under the statutes of this State cannot legally appear thereon.

The Act of April 9, 1873, as amended by the Act of April 8, 1881, in addition to prohibiting the replacing upon the assessment lists of the names of poll taxables returned as delinquents within the period of twelve months next after their allowance as delinquent, provides penalties against the placing of fictitious names upon the

assessor's lists or the names of persons not entitled to be assessed in the hundred or assessment district, or fraudulent names.

There is nothing in the Act of 1881 which by the remotest implication restricts the power of the Levy Court in dropping illegal names to only one of the above classes.

The Act of 1873 as amended by the Act of 1881 is to be construed by the provisions contained within its four corners and not in accordance with what any individual may suppose or understand to have been the purpose of the Act.

The Act of 1873 as amended relates to other subjects than the assessment of poll taxables. Section 2 shows that it relates to property assessments as well as poll assessments ; and sections 4 and 7 show that it deals with fictitious names and persons nonresident in the hundred or assessment district. There is no legitimate process of reasoning by which the right of the Levy Court to drop names can be restricted to the names of poll taxables returned as delinquent and placed upon the list within twelve months next after their allowance as delinquent.

It is inconceivable that the Legislature intended under the Act of 1881, when using the words " legally appearing thereon " generally, that the Levy Court should not have the power to strike off precisely the same classes of names which under the old law the assessor had no power to put on his list, and against the placing of which on the list the Act of 1873 as amended in 1881 leveled severe penalties.

The affixing of a penalty to the commission of an act renders the act itself unlawful and a nullity. Suth. Stat. Const. § 335.

Therefore not only can the assessor be punished criminally for the placing of fictitious names on his list and the names of persons not entitled to appear thereon but

22

such names so placed thereon are illegally thereon and consequently do not legally appear thereon.

Section 7 of the Act entitled, " An Act in Relation to the Levy Court of New Castle County " (p. 58, vol. 19, Del. Laws), commonly known as the Five Commissioners Bill, recognizes the power of the Levy Court to finally settle and determine the assessment list. Rev. Code, chap. 8, p. 63, § 16.

The monstrous results which would flow from a judicial construction of the legislation in question in accordance with the contention on the part of the complainant should have great weight in supporting the contention of the defendants.

Upon the contention on the part of the complainant an unlimited number of fictitious names might, and as experience proves, would, burden and falsify the assessment list as finally settled and determined by the Levy Court, and would defeat the precise purpose of the whole scheme of the making of an assessment list, viz., that it should be a true list and furnish a reliable basis for the adjustment of the tax rate.

It would not only produce confusion in the conduct of the fiscal concerns of the county by rendering it impossible for the Levy Court to accurately provide the requisite revenue, but would also inevitably lead to false registration of voters and the debauchery of the ballot-box.

No irreparable injury could result to any one from the exercise by the Levy Court of its functions in striking off names from the assessment list.

*John H. Rodney*, for the minority of the Levy Court defendants.

THE CHANCELLOR.—I have stated above all the material portions of the bill of complaint and the two answers thereto respectively, so that there may be no mistake or uncertainty in respect to the reasons governing me in the

conclusion to which I have arrived or in the decision I may make.

If the recital or analysis of the provision of the bill and answers have been unduly long or apparently prolix, it is better to err in these respects, than to be wanting in a due and careful consideration in respect to the matters submitted for my consideration.

We are all liable to err, however desirous we may be to be right. He is fortunate who after the most careful study and consideration is assuredly right and has a consciousness of duty carefully and conscientiously performed. I would that the duty of deciding the questions involved in the controversy arising in this case could have been imposed upon others, and not upon myself. Not that I wish or desire to avoid the discharge of any duty imposed upon me by reason of my official position, but it is not unreasonable to have wished that the performance of this duty might have devolved upon others abler and more competent to perform it than myself. But it was said, in the course of the argument, and it may be true, that no tribunal is existing in the State for the decision of the matters in controversy, other than that of the Court of Chancery. I therefore assume the duties of my position without fear, favor, reward, or the hope thereof.

The community constituting the inhabitants of the County of New Castle may have allowed itself to have been wrought up to a state of excitement and interest, unreasonable and unnecessary, but we all must indulge the hope that such excitement, if it exists, will pass away, and the public mind and public feeling become calm and serene when time has given an opportunity for rational consideration and calm reflection.

I shall not notice that portion of the bill of complaint which states that William P. Biggs is a citizen and taxable duly assessed, of the County of New Castle, because it does not appear if he is such citizen and taxable that

he has been taxed beyond his proportion of the taxes to which other citizens and taxables are subject or liable. But the complainant shows that he is clerk of the peace of the said county and says that the functions, duties, and responsibilities of his said office are about to be impaired, invaded, and overthrown by the threatened and impending action of the said Levy Court commissioners in unlawfully altering and reducing the number of names upon the assessment list so that it would be morally and legally unjust and improper for the said clerk of the peace to join in the certification of the said lists when names have been so omitted therefrom, and the said clerk of the peace would also become personally liable to heavy legal pecuniary penalties for certifying and furnishing duplicate lists to the county officers for collection from which names on the assessment lists when returned by the assessors had been stricken off by the said action of the said Levy Court. Now it is admitted by both answers filed in this cause that the said William P. Biggs is clerk of the peace of New Castle County, and clerk of the Levy Court of said county. There is no proper plea to the jurisdiction of this court to hear and determine the matters in controversy in this cause for the allegation contained in the thirteenth and concluding paragraph of answer of the majority of the Levy Court, that these defendants are advised and believe that the said complainant, William P. Biggs, has no right to bring or maintain this suit as a citizen, taxable, and resident of New Castle County, and as clerk of the peace for said county or in any of said capacities, either in his own behalf, or in behalf of other taxables, citizens of said county, does not raise the question of jurisdiction in this court to hear and determine the matters in controversy in this cause. But only whether the complainant in any or either of the capacities in which he sues has a right to bring and maintain this suit.

Now I have already said that I shall not consider the question whether as a citizen and taxable of New Castle County he is liable to the payment of a tax because his liability in this respect is the same as that of other taxable citizens of said county. On this ground, therefore, the complainant would have no right to maintain his suit for relief common alike to himself and all other citizens and taxables of said county. But it is a very different question whether the complainant being clerk of the peace of New Castle County and as such being clerk of the Levy Court of such county has a right to maintain this suit, and has the right to invoke the equitable interposition of this court.

If the functions, duties, and responsibilities of his office of clerk of the peace are about to be impaired, invaded, or overthrown by the threatened and impending action of the said Levy Court commissioners in unlawfully altering and reducing the number of names upon the said assessment lists so that it would be morally and legally unjust and improper for the said clerk of the peace to join in the certification of the said lists when names have been so omitted therefrom; and if the said clerk of the peace would also become liable to heavy pecuniary penalties for certifying and furnishing duplicate lists to the county officers of collection from which names which were on the assessment lists when returned by the assessors had been stricken or removed by the said action of the said Levy Court,—a very different question arises from that under the question whether as a citizen and taxable he is liable or not liable for his proportionate share of taxes levied upon all other citizens and taxables for the support of the government of New Castle County.

Considered in this view, the complainant has a right to bring and maintain his suit in this court, if the allegations of his bill in this respect are true.

The two main grounds of contention on the part of the

defendants and which were urged at the hearing at great length and with much ability and vigor are : First, that the power given to the Levy Court in sections 9 and 12 of chapter 8 of the Revised Statutes to " correct and add to the assessments returned" and to make " additions to and corrections of the assessment list " includes the power to strike from the list the names of any that they may judge unlawfully thereon ; second, that the inhibition contained in the 6th section of the Act of 1873 as amended by Act of April 3, 1881, vol. 16, Laws of Delaware, page 306, to wit, " that it shall not be lawful for the Levy Court in either of the counties of this State or any member thereof to take from the assessment returned to the said Levy Court by any assessor, the name of any person legally appearing thereon,"—by implication gives to the Levy Court the same power and jurisdiction.

A careful examination and consideration of the statutes brings one to the conclusion that the power " to correct," is never given in connection with the power " to take off," names from the assessment lists.

The power " to correct " is given to the Levy Court in connection with the power to add to the assessment lists and is always in context with the valuation of property the increasing or diminishing the amount of the assessments and the " adding" to the lists the names of those who have been omitted and determining their assessments.

When the Legislature has provided for the dropping or taking from the assessment the names of any persons that should not be thereon it has shown that it knew how to use apt and express words for that purpose. And it has always indicated with precision the very names which should be taken off and never left it to any direct provision of law to the discretion judicial or otherwise of any person or body of persons to determine what names should be dropped from and what should remain on the

assessment list and that this should be so is easily seen when we consider how serious the function of taking the names of persons from the assessment list may be in relation to the elective franchise, more serious far than the function of adding names to such lists. Because if a name should be added improperly, it can only give such person the right to vote if he is qualified to do so under the constitution and under the safeguards thrown around the exercise of the elective franchise by law; but if a person's name should be improperly dropped his right to exercise his constitutional elective franchise is entirely extinguished.

Now it would not be expected that the Legislature animated with a just regard of the fundamental rights and liberties which they are bound to protect, would in the view of the matter carefully provide for and protect the rights and duty of adding names to the assessment lists, and then leave it to the general power of correction given to the Levy Court to drop names at their discretion.

We do not think the Legislature have so acted, but as they have only given the power to add names by express language to that effect, so they have only given the power to take off names by the use of language likewise explicit and express.

We do not think, therefore, the words "correct and add" and "make additions and corrections" in the ninth and twelfth sections of chapter 8 of the Revised Statutes or wherever else they may occur, are to be taken in this case as equivalent to the words "take off and add" or "make additions to and omissions" from the assessment list.

Now as to the second ground for the contention that this power and jurisdiction to take names from the assessment list belongs to the Levy Court—the majority of

the defendants say that it is conferred by implication by the insertion of the word "legally" in the sixth section of the Act of 1881. We quote again the part of said section referred to—"Section 6. Be it further enacted as aforesaid that it shall not be lawful for the Levy Court in either of the counties of this State or any member thereof to take from the assessment returned to the said Levy Court by any assessor the name of any person legally appearing thereon." Vol. 16, Laws of Delaware, page 306.

The Levy Court of New Castle County is not, in any legal proper sense of the term "court," a judicial body known to the Constitution as part of the judicial system of this State, and possesses no judicial power as recognized in such Constitution or judicial system. It is composed of a certain number of freeholders of the county who exercise some few quasi judicial functions and powers, but for the most part powers and functions which are no greater or essentially different from those purely ministerial. The powers and functions of the Levy Court are derived from and are clearly defined in the Acts of the Legislature. They are truly statutory. The Levy Court possesses no inherent or original powers. Its functions and powers are defined and limited by statutory law. They are thus entirely limited and circumscribed.

Let us consider the state of the law in regard to this matter of assessments and the duties of assessors and levy courts as prescribed thereby.

The office of assessor is created by law, and the duties attaching to it are carefully defined and described. He is elected in and for a comparatively small district, presumably from his knowledge and acquaintance of and with persons and property therein.

He must in the first instance act on his own knowledge

and information in making his lists and valuations, and then he must expose the same in five public places in his district for examination, and afterwards he must sit at a convenient place and times prescribed by law, to place upon the lists those who in the manner provided by law prove their right to be so placed.   The provisions of law prescribing his duties are exceedingly precise and stringent, and if he obeys them, the lists made by him will be as accurate and fair as human agency can make them.

He is then required to return them to the Levy Court, and so careful is the law that every one who has the right to be assessed shall have the opportunity that it again provides in the express words for the Levy Court adding to the lists the names of any that may have been omitted by the assessor, and prescribe with particularity for the mode and manner in which such additions shall be made. But we again note that there is no authority expressly given to the Levy Court, or to any body to take from the lists so returned any name whatever and no method or manner of doing so is described.

At the time of the passage of the Act of 1881, there had been for eight years on the statute books a law that required the collectors of county taxes in the several counties of the State to give notice of sittings at certain times and places for the collection of taxes.   And that when any such collectors should make return at the proper time to the Levy Court of a delinquent list of poll taxables accompanied by oath that he had conformed to the requirement of the law stating therein specifically, it should be the duty of the Levy Court to make allowance to said collector of delinquents so returned by him, and that "the names of such delinquents should be dropped from the assessment lists by the Levy Court, and shall not be placed thereon again for a period of twelve months from and after the date of such allowance."

The ninth section of the Act of April 9, 1873, also provides "that it shall not be lawful for the assessor or any Levy Court upon the personal application of any one, or otherwise to place upon the assessment in any hundred the name of any person who, having failed to pay the county tax assessed against him or her for the preceding year was returned and allowed as a delinquent until after the expiration of the twelve months from the time such allowance as delinquents was made by the Levy Court."

So that at the time of the passage of the Act of 1881 the law pointed out with exceeding precision the names which should be dropped by the Levy Court from the assessment list, and which during a prescribed period should not legally appear thereon. It is to be observed that the duty enjoined on the Levy Court to drop these names is ministerial and not in any sense judicial. The names to be dropped are a matter of record to the Levy Court. They do not have to be ascertained *dehors* the record. All the names on the designated record must be dropped. The Levy Court has no discretion to drop some and retain others.

Now let us consider what the force and effect of the word "legally" in the sixth section of the Act of 1881 is, and to what it has relation. Manifestly it would seem to the provisions of law just quoted. Suppose a name had been returned on his list by the assessor which had been within the twelve months returned as delinquent by the collector, and had in obedience to law been dropped by the Levy Court from the assessment list; the law forbade the assessor to add that particular name to his list, and declared that it should not be placed thereon by anybody. Clearly such a name did not "legally" appear thereon. The law itself points out and designates the very names which cannot thus "legally" appear on the assessment—nothing is left to the judicial determination

of any one in order to ascertain them. But this cannot apply to names which some person or persons, no matter how responsible, may aver to be on the lists illegally, by reason of some alleged transgression of the law by the assessor, but which cannot be determined except by judicial inquiry. The presumption of the law is that the assessor has performed his duty, and when he returns his assessment at the time and in the manner provided by law, the names thereon legally appear, unless the law itself makes the contrary appear, by pointing out ascertained names that are forbidden to appear thereon. To drop these involves only the performance of a ministerial duty. But to drop those which the answer of the majority of the Levy Court declares they intend to drop, involves a very different kind of duty, to wit, a *quasi* judicial one. That this is true, we need only refer to paragraph eleven of the answer of a majority of the defendants, which states explicitly and frankly the power claimed by them and what, if not restrained, they intend to do in this regard. It is as follows:

"11. These defendants further answering say, that since Tuesday, the second day of February, instant, sundry reputable and responsible citizens and tax-payers of New Castle County have openly and publicly charged that a very large number of names appearing upon some of the said assessment lists returned by said assessors to the said Levy Court, on the second day of February, instant, were unlawfully placed and do not legally appear upon said assessment lists, and that the said names, so unlawfully placed upon said assessment lists, include a large number of fictitious names placed upon said lists in direct violation of the statute of this State in that behalf, and also a large number of names of poll taxables who were not residents of the hundreds or assessment districts from which they were respectively returned by said as-

sessors as assessed, placed upon said lists in direct viola-
tion of the statute of this State in that behalf, and also a
large number of names of poll taxables already assessed
and standing upon the assessment lists of said hundreds
or assessment districts respectively, and unlawfully
placed upon said assessment lists returned on the second
day of February, instant, as aforesaid; and also a large
number of names of poll taxables unlawfully and fraudu-
lently duplicated upon said assessment lists, returned as
aforesaid. That they are now engaged in the examina-
tion of said assessment lists so returned as aforesaid for
the purpose of ascertaining whether or not names appear-
ing upon said lists have been unlawfully placed thereon
as aforesaid; and these defendants as constituting a ma-
jority of the said Levy Court propose and intend, should
they be satisfied upon due examination that any names
have been so unlawfully placed upon said assessment lists
so returned as aforesaid and do not legally appear there-
on, to cause the same to be stricken from said lists, not
by obliteration, erasement, defacement, or mutilation of
said lists or any part thereof, but by the placing of a dis-
tinguishing mark upon or opposite to such name as shall
be stricken from said lists.

Here is a claim of a judicial power of a very high and
important character. No mode is prescribed in the law
for the exercise of this power. They may have evidence
or not as they please, they may or not rest satisfied with
the charges, and believing them to be true proceed forth-
with without hearing or notice to drop any or add the
names thus inculpated. There is no instance of any pre-
vious or subsequent legislation undertaking to grant such
a power. I need not dwell upon the importance and
value of the rights it proposes to deal with. If it exists
it can make the lists of persons qualified to vote what the
majority of the Levy Court pleases; surely the assertion

of a power so far reaching as to be able to overthrow all the security of the elective franchise should not be made except upon direct and express authority of the Legislature. But there is no direct or express authority anywhere to be found in the statutes of the State for such a monstrosity of assumption. At best it is claimed to rest upon the " implication" arising from the use of the word " legally " in the sixth section of the Act of 1881. The argument is that inasmuch as the Act says that it shall not be lawful for the Levy Court or any member thereof to take from the assessment returned by the assessor the name of any person " legally appearing thereon," that therefore the Levy Court may take from such assessment the name of any person which they may judge to be there illegally—without pausing now to repeat what we have before said that such a power must rest upon positive and direct expression of the legislative will and not upon implication—we observe that if the implication " legally " clothed the Levy Court with this high judicial power, it may be well argued that it clothed with like power " any member thereof." The language being that it shall not be lawful for the Levy Court or " any member thereof " to take from the assessment lists the name of any person legally appearing thereon. This of course might be said to be monstrous, but it serves to show the danger of arguing the existence of the judicial power from anything except the express grant of legislative enactment.

The Law of 1873 in regard to the return by the collectors of delinquent poll taxes and their allowance by the Levy Court and the requirement that the names of such delinquents be dropped by the Levy Court from the assessment and that they should not be put on again by the assessors for the period of twelve months has been repealed by the Act of May 13, 1891, and May 15, 1891.

The conclusion is therefore reached that the defendants the members of the Levy Court of New Castle County, are not authorized by law to drop from the assessment lists returned to it by the several assessors of said county any names appearing thereon, or to do any of those things which in the eleventh paragraph the majority of said court say they propose and intend to do. It seems clear, therefore, from the best consideration which I have been able to give to the subject in the brief period in which it has been considered by me that the clerk of the peace of New Castle County has a special interest in regard to the duties of his office as imposed by law in the integrity of the assessment lists as they left the hands of the assessors.

"It is a monstrous proposition" said Mr. Bradford in his argument in this cause "that the Levy Court clothed with this power had not the right for the purpose of settling a true basis for the adjustment of the tax rate to strike from the assessment lists required to be submitted to it for its revision and correction fictitious names and other names illegally placed thereon." How much more monstrous is the proposition that the Levy Court has the power to strike from the assessment lists returned to it or the clerk of the peace the names of persons on the assessment lists so returned when the clerk of the peace is by law required to place upon his duplicates the names returned by the assessors and as returned by the assessors. This is the question to be decided on the statute as it is and on this alone.

The clerk of the peace is bound to obey the law as it is and not as others by implication would have it to be. Fortunately for the people of the whole State the law by which they are governed is clearly expressed and not the subject of implication merely. This express law of the State would subject the clerk of the

peace to pecuniary penalties if he fails to observe and obey it. What would be the consequences if the proposed action of the Levy Court was to be adjudged legal, and the Levy Court of New Castle County be adjudged to possess the power which they claim in respect to the assessment lists as returned by the assessors, and what would be the consequences, if their example was followed in the other counties of the State, it is not for me to determine or even to imagine.

This opinion had been dictated thus far when my eye almost accidentally fell upon the fifth paragraph of the answer of the members of the majority of the Levy Court. I do not recollect that this paragraph was particularly discussed if discussed at all, in the argument of this cause, and my attention to it may not have been called in the argument. Let us consider it. It is in these words :

" These defendants do not admit, but on the contrary deny, the truth of the allegations contained in paragraph 5 of said bill of complaint in manner and form as the same are therein set forth; and they further deny that the said Levy Court commissioners since the return of the said assessment lists as aforesaid, have unlawfully or wrongfully obliterated, erased, or stricken off the names of any persons appearing on the said lists returned by the said assessors as taxables of the said county.

"And these defendants in further answer to the allegations contained in said paragraph five aver that whatever names have been stricken by the said Levy Court commissioners from the said assessment lists as returned as aforesaid, were names illegally placed thereon, and that the said Levy Court commissioners have not nor have any of them obliterated or erased any of the names so stricken from said lists."

What is the meaning of this paragraph? Whatever names say the majority of the Levy Court have been

stricken by the said Levy Court commissioners from the
said assessment lists as returned as aforesaid were names
illegally placed thereon and that the said Levy Court com-
missioners have not nor have any of them obliterated or
erased any of the names *so stricken* from the said lists.
Is or is not this an admission that the Levy Court com-
missioners have stricken *some* names from the said assess-
ment lists as returned without stating what or how many?
If they have the question whether the names were ille-
gally placed thereon is not a question for the Levy Court
commissioners to decide themselves but one for this court
to decide.   It is not for the Levy Court commissioners
to assume that such names were illegally on the assess-
ment lists as returned as aforesaid and that therefore
they had the right to strike them therefrom, for that is
one of the points of contest or controversy in this cause.
If these names were on the assessment lists when re-
turned to the said Levy Court then this court has already
indicated the opinion that they could not be stricken
therefrom by the Levy Court commissioners.   The
answer in the sixth paragraph is also dubious and uncer-
tain.   The majority of the members of the Levy Court
therein say " that they do not admit, but on the contrary
deny, the truth of the allegation contained in paragraph
six of said bill of complaint in manner and form as the
same are therein set forth and they further deny that it
was or is the intention or purpose of the said commission-
ers of the said Levy Court to change or alter the said
lists or any of them *by arbitrarily and without warrant
of law* striking off or expunging therefrom any names
or name whatsoever appearing thereon.   Now this is not
the question in this case.   The question is, Have the Levy
Court already stricken off or is it the intention or pur-
pose of the said commissioners of the said Levy Court to
change or alter the said lists or any of them by striking

off or expunging therefrom any name or names whatsoever appearing thereon at the time when the same were returned to the Levy Court. If they have stricken off or expunged from the lists so returned or changed or altered the said lists by striking or expunging therefrom any names or name whatsoever appearing thereon, the charge of so doing is not satisfactorily answered by saying that said action was not done arbitrarily or without warrant of law, for that question is for this court to decide and not for these defendants to determine for themselves when the propriety and legality of such action is the matter in controversy in the cause. It won't do for a majority of the Levy Court to say as they have done in their answer to this paragraph of the bill that they, as constituting a majority of the said Levy Court, intend to cause to be stricken from said assessment lists so returned as aforesaid such names and only such names as the said Levy Court, while engaged in the discharge of what they term legal duty imposed upon it of revising and correcting lists, shall be satisfied on due examination were unlawfully, and do not legally appear, thereon. For the very question to be decided is whether the lists so returned by the assessors to the Levy Court can be revised and corrected by striking therefrom names which were thereon when returned to the Levy Court and before the process of revising and correcting in said answer mentioned was undertaken or performed. In like manner the seventh paragraph of the answer of the majority of the members of the Levy Court might be analyzed and its true meaning discovered. Whether the number of names upon the said lists of persons assessed as taxables has or has not been reduced by the members of the Levy Court making their answer to the bill of complaint since the lists on which said names appeared were returned to the Levy Court is the question, and whether there was

legal authority for the reduction of the number of names upon the said list of persons as taxables is more pertinently the issue involved. But the character of this answer already sufficiently appears by the examination and analysis which I have given it, and further time devoted to the performance of such duties may seem to be needlessly spent and such examination appear needlessly prolix and uninteresting.

During almost fifty years I have been a member of the bar of the State of Delaware. In early life I was counsel for the Levy Court in the county in which I then resided, and during that period of time I have never known and I have never heard, until the argument of this case, the course which a majority of the Levy Court of New Castle County say in their answer they intend to pursue, pursued by the Levy Court in any county of this State. It is too late, therefore, for me officially to recognize its propriety, lawfulness, or judicially to give countenance thereto.

Finally I remark that the Levy Court of New Castle County is not, in the strict or proper sense of that word, a court, but is a body of commissioners elected and constituted as in the statutes of the State is prescribed, with limited and well-defined powers and duties; which powers and duties are in some respects, and in some respects only, quasi judicial, but in most respects ministerial only.

I, therefore, adjudge and decree as follows:

And, now, to wit, this second day of March, A. D. 1892, it appearing to the Chancellor that William P. Biggs, being the clerk of the peace of New Castle County and *ex officio* clerk of the Levy Court of New Castle County, has a right to bring and maintain his suit in this court, for the causes alleged and existing, and is entitled to a decree of this court for his protection as such clerk

of the peace and clerk of the Levy Court, the Chancellor, after hearing the arguments for the complainant and respondents, respectively, and after considering the same, doth see fit to order, adjudge, and decree, and doth hereby order, adjudge, and decree, that Richard G. Buckingham, James H. Clark, Andrew S. Eliason, Isaac N. Grubb, Paul Gillis, Henry D. Hickman, David P. Hutchinson, John W. Jolls, Samuel Kilgore, Robert B. Simpler, and Robert Sutton, Levy Court commissioners for New Castle County, be and they are hereby restrained and enjoined from striking from the said assessment lists made and returned when and as stated in said bill of complaint to the said Levy Court by the said assessors named in said bill, any names or name whatever appearing upon the same and returned as taxables of the said county; and that any other names which have been added to the said lists otherwise than at the time and place and in the manner provided by law in that behalf since the said return of the said assessment lists be and the same are hereby ordered to be stricken from the said lists; and it appearing to the Chancellor that Richard G. Buckingham, James H. Clark, Paul Gillis, David P. Hutchinson, John W. Jolls, and Robert B. Simpler, a majority of the members of the said Levy Court, did and performed, or threatened and intend to perform, the acts, deeds, and things complained of against the protest of Andrew S. Eliason, Isaac N. Grubb, Henry D. Hickman, Samuel Kilgore, and Robert Sutton, the minority of the said Levy Court, who have in substance confessed the bill, it is further ordered, adjudged, and decreed that the said Richard G. Buckingham, James H. Clark, Paul Gillis, David P. Hutchinson, John W. Jolls, and Robert B. Simpler, being a majority of the said Levy Court, pay the costs in three months or attachment.